STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
LOCATION: Portland
DOCKET NO. BCD-CV-2020-00020

BRETT DEANE, HENRY
LAVENDER, JOLEEN MITCHELL,
PAULINE NELSON, and KAREN
GEORGE,

Plaintiffs,

v.

CENTRAL MAINE POWER
COMPANY,
Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

**ORDER DENYING PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION**

## INTRODUCTION

The named Plaintiffs claim Defendant Central Maine Power Company ("CMP")

improperly threatened to disconnect electric power from its customers during the

winter months. They seek to press a claim of intentional infliction of emotional

distress on the basis of CMP's conduct. Plaintiffs have moved to certify a class, under

Rule 23 of the Maine Rules of Civil Procedure, proposing they be designated as class

representatives for a class of Maine residents described as follows:

> All CMP residential electricity customers to whom CMP sent or
> delivered written or oral communications that threatened actual or
> potential disconnection of the respective customers' electricity
> ("disconnection communications") between November 15 of each year
> and April 15 of the following year, beginning on January 28, 2014 and
> ending with the date of trial in this case.

(Pls.' Mot. Class Cert. 1.) Plaintiffs also seek to certify three subclasses under M.R.

Civ. P. 23(c)(4)(B), described as follows:

1

General Disconnection Notice Subclass: All CMP residential electricity customers to whom CMP sent or delivered disconnection communications regarding disconnection of electric service between November 15 of each year and April 15 of the following year, beginning in January 2014 through the present, (1) that threatened disconnection of a customer's electric service on or after a given date and (2) that also did not disclose that (A) disconnection can only occur if CMP first requests and obtains the permission from the Consumer Assistance and Safety Division ("CASD") of the Public Utilities Commission, and (B) the customer would receive a copy of CMP's request and be afforded an opportunity to apprise the CASD of their unique circumstances.

PUC Language Disconnection Notice Subclass: All CMP residential electricity customers to whom CMP sent or delivered disconnection communications regarding disconnection of electric service between November 15 of each year and April 15 of the following year, beginning in January 2014 through the present that stated or represented that CMP could disconnect the customer's electricity service "without the approval" of the Public Utilities Commission.

"With Permission" Disconnection Notice Subclass: All CMP residential electricity customers to whom CMP sent or delivered disconnection communications regarding disconnection of electric service between November 15 of each year and April 15 of the following year, beginning in November 2020 through the present, that stated or represented that CMP could disconnect the respective customers' service "[w]ith permission from the [PUC]" on a certain date or within 20 business days of that date.

(Pls.' Mot. Class Cert. 1-2.) All named Plaintiffs seek to represent the General Disconnection Notice Subclass; Plaintiffs Deane, Lavender, Mitchell, and Nelson seek to represent the PUC Language Subclass; and Plaintiff George seeks to represent the "With Permission" Subclass.

The Court heard oral arguments on January 20, 2022 in which both parties appeared through counsel. For the reasons discussed below, the Court DENIES Plaintiffs' motion.

2

## ALLEGED FACTS

Plaintiffs Deane, Lavender, Mitchell, Nelson, and George are residential customers of CMP residing in various parts of the State. Each received one or more notices ("Disconnection Notice") from CMP in either 2019 or early 2020 threatening disconnection of electric power if payment was not made. Plaintiffs assert that receiving these notices under the perceived threat of losing their power in the winter months caused extreme distress to each of them.

CMP transmits and delivers electricity to more than 624,000 customers in an 11,000-square-mile area in Maine. It bills its residential customers for transmission and distribution services and for the electric power purchased by the customers, either under its "Standard Offer" or pursuant to contracts with the electric power producers whose electricity it transmits and distributes. CMP retains the right to disconnect its service and stop providing electricity to customers who fail to timely pay bills from CMP for its services rendered and electric power supplied, if allowable under State regulations. As a public utility subject to regulation by the Maine Public Utilities Commission ("PUC"), it is required to abide by rules promulgated by the PUC in many aspects of its business, including its disconnection practices. These rules are collected at Chapter 815, Section 10 of the Maine Code of Administrative Regulations.

Since 2008 the PUC has had in effect special rules restricting and governing the right of CMP to disconnect customers during the "Winter Disconnection Period" which extends from November 15 to April 15 each year. *See* 65 C.M.R. ch. 815, §

2(GG). These rules, set forth in Section 10(M) of Chapter 815, protect vulnerable consumers from potentially severe hardship resulting from the loss of electricity during the winter months. In short, during the Winter Disconnection period, a utility cannot disconnect residential electricity service without having obtained affirmative permission from the Customer Assistance and Safety Division ("CAD") to do so. § 10(M)(4). It must also disclose to the customer certain rights and information about the disconnection process and has a duty to ensure that the customer with whom it is in contact is not disconnected if at all possible by offering different payment arrangements which take into account that customer's unique circumstances. §§ 10(M)(2), 9(F)(5). This includes providing the customer with notice that CMP has requested permission from the CAD to disconnect and providing a copy of that request. The notice sent to the customer must also disclose what the customer must do to avoid disconnection; if the customer contacts CMP but CMP and the customer are unable to come to terms on a payment arrangement, CMP must refer the matter to the CAD. § 9(F)(1).

CMP must attempt to make personal contact with the customer either by an in-person visit to the premises or by telephone. § 10(M)(1). If the customer responds within five business days, CMP must comply with Section 9(F)(5)'s mandate of working to arrange a payment plan. § 10(M)(2). Should the customer not respond, CMP may seek permission from the CAD to disconnect or, if CMP is uncertain the premises are occupied, may "cycle disconnect" during daylight hours and weekdays. § 10(M)(3). If CMP is aware the premises are occupied, it may not disconnect in any

4

way without CAD permission. The CAD has discretion to set the timing and nature of disconnection during the Winter Disconnection Period, such as by limiting it to a cycle disconnection or postponing it until the spring.

Under CMP's winter disconnection processes, it first issues a general winter disconnection notice, relevant to the General Disconnection Notice Subclass. The form notice used in the winter from 2014 through 2020 is the same form used in non-winter months and does not indicate that the customer possesses additional protections during the winter. It does not state CMP needs CAD approval prior to disconnection but rather presents two options to the customer to avoid disconnection; making a payment online or calling CMP to arrange a payment plan. It also states, "[u]nless you take action, your electric service is scheduled for disconnection on [the relevant disconnection date] or within 20 business days of that date." It does not mention that the customer has two additional options, namely appealing to the CAD to establish a payment plan to which CMP must adhere or rejecting any payment plan proposed by CMP, forcing it to seek permission from CAD to proceed with the disconnection.

CMP has also used two other disconnection notices since at least January 28, 2015, which CMP refers to as its "premises visit" notice and "Letter 180," relevant to the PUC Language Subclass. These notices state substantially the following: "Failure to contact us may result in disconnection of your electric service. Approval of the Consumer Assistance Division of the Maine Public Utilities Commission is not required." In 2015, the Deputy Director of the CAD warned CMP that this statement

5

was contrary to Chapter 815 regulations. Also in 2015, CMP sought a waiver allowing it to use a modified version of the standard winter disconnection notice language as provided in Appendix A to Chapter 815 which would have included the language above and lacked reference to special payment arrangements. The CAD denied this request and subsequently granted a revised request which eliminated this language. CMP took the problematic language out of its notices but kept it in other communications, such as Letter 180. The Director of the CAD in 2018 again notified CMP that this type of language was inconsistent with Chapter 815 and instructed CMP to cease using it. A PUC investigation in 2020 into these communications resulted in a $500,000 penalty assessed against CMP for its willful and serial violation of Chapter 815 under 35-A M.R.S. § 1508-A(1)(A).[1]

After the PUC administrative proceedings on the premises visit notices and Letter 180, CMP modified the language in its general winter disconnection notice, used beginning when the PUC disconnection moratorium ended in November 2020. These notices, relevant to the "With Permission" Subclass, inform the recipient that "[w]ith permission from the [PUC], your service could be disconnected on [the relevant disconnection date] or within 20 business days of that date." They do not state that this permission has not yet been granted nor that the PUC provides avenues for avoiding disconnection other than immediate payment or privately arranging a payment plan with CMP.

---

[1] *Central Maine Power Company*, Investigation of Improper Notices by Central Maine Power Company (35-A M.R.S. § 1303), No. 2020-017, Order (Me. P.U.C. Aug. 5, 2020).

6

Class actions are governed by M.R. Civ. P. 23. A putative class must meet all Rule 23(a) requirements and at least one Rule 23(b) requirement. The Maine rule is virtually identical to its federal counterpart, and Maine courts "value constructions and comments on the federal rule as aids in constructing our parallel provision." *Bean v. Cummings*, 2008 ME 18, ¶ 11, 939 A.2d 676, 680 (citations omitted). In determining whether a class should be certified, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (citations omitted). However, certification "generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978).

The substantive law at issue is a claim of intentional infliction of emotional distress, which comprises four elements: (i) the defendant intentionally or recklessly inflected severe emotional distress or was certain or substantially certain that such distress would result from the defendant's conduct; (ii) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (iii) the actions of the defendant caused the plaintiff's emotional distress; and (iv) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it. *Lyman v. Huber*, 2010 ME 139, ¶ 16, 10 A.3d 707. The severity of the emotional distress is measured against an objective standard, meaning the plaintiff

must show evidence of objective symptoms such as shock, illness, or other bodily harm, which typically requires expert medical or psychological testimony that the emotional injury has resulted in a recognized defect. *Id.* ¶ 21.

Plaintiffs allege that the Disconnection Notices and similar communications to customers about disconnection of service during the Winter Disconnection Period subject to Chapter 815, Subsection 10(M) deceptively fail to inform the customers to whom the communication is directed that the threatened disconnection cannot take place without the consent of the CAD, and thereby give the misleading impression that the customers are subject to summary disconnection without recourse at CMP's sole discretion. Plaintiffs further allege that these notices purposely deprive the customer of information the customer is entitled to as part of a strategy to inflict emotional distress and force the customer to make a payment as soon as possible, regardless of what the Chapter 815 regulations require. Plaintiffs contend CMP's intent is evinced through, inter alia, (i) CMP's prior efforts to obtain PUC approval for the use of certain language in its winter Disconnection Notices and its actions in response thereto; (ii) the express language used in CMP's notices and letters, and (iii) the language CMP is required to use but which it omits.

A. <u>Rule 23(a)</u>

Under the Maine Rules of Civil Procedure, a class may be certified where:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

8

M.R. Civ. P. 23(a). Plaintiffs bear the burden of proof under Rule 23(a) and must affirmatively demonstrate their compliance with each element. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Plaintiffs allege more than 1.4 million disconnection notices were sent and estimate at least several hundred recipients have actionable claims for this class action, making joinder impracticable; that questions of CMP's intent in sending the notices, the meaning and fair construction of the notice language, the intimidating and frightening effect of the notices, the appropriateness of punitive damages, and the size of punitive damages awards are common to all class members; that the claims of the named Plaintiffs are typical to the class because they received identical or substantially similar printed, electronic, or verbal threats of disconnection; and that the named Plaintiffs will fairly and adequately represent and protect the interest of the class. CMP primarily challenges the commonality and typicality requirements of Rule 23(a). To the extent CMP challenges the numerosity and adequacy requirements, this Court finds the class sufficiently numerous and the named Plaintiffs adequate.

*1. Commonality*

There must exist a question or questions of law or fact common to all members of the class, but these questions need not be identical nor does every question need to be common to every member of the class. *Karofsky v. Abbott Labs.*, No. CV-95-1009, 1997 Me. Super. LEXIS 316, at *22 (Oct. 15, 1997). Rather, the focus is on the commonality of the defendant's liability to all class members. *Id.* In other words, the

court must be able to "generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores*, 564 U.S. at 349. Plaintiffs cite *Karofsky*, which found common questions of law and fact in connection with allegations of an illegal price-fixing scheme conspiracy, to support their contention that questions of the existence, scope, and efficacy of CMP's Disconnection Notices are sufficient to meet Rule 23(a)(2)'s commonality requirement. 1997 Me. Super. LEXIS 316, at *23.

Plaintiffs point to CMP's intentional use of exaggerated or misleading winter Disconnection Notices to allegedly inflict severe emotional distress, describing this tactic as extreme and outrageous, as the source of CMP's common liability to all class members. But regardless of what this Court finds as to the first two elements, to establish injury and causation under this claim such that CMP could face common liability to the class for intentionally causing emotional distress, the Court would have to take evidence from each individual class member about whether that member (i) received and read the Disconnection Notice; (ii) suffered emotional distress as a result; and (iii) such distress was so severe no reasonable person could endure it. *See Lyman*, 2010 ME 139, ¶ 16, 10 A.3d 707. This is an individualized inquiry because the answers would naturally vary amongst the class members. Unlike *Karofsky*, where the common questions of law and fact pertained to the conspiratorial conduct of the defendants, the questions in the instant action relate to the impact of CMP's conduct on the putative class. Some members may have received the Disconnection Notice but not read it. Those that read it may not have suffered any emotional distress for one reason or another, such as because they had forgotten to pay their bill but had

10

the money to do so or they simply did not take it as a serious threat. Even those that did suffer some emotional distress would have suffered it to different extents and manifested different, if any, symptoms. Though Plaintiffs propose bringing expert testimony as to why CMP's conduct could likely cause severe emotional distress, such evidence approaches the issue from the wrong side. The fourth element specifically requires that the emotional distress *suffered by the plaintiff* be sufficiently severe. *Id.* Any individual can and must bring evidence as to the severity of his or her emotional distress to press such a claim, but the requirement of individualized showings forecloses a finding of commonality such that the named Plaintiffs represent emotional distress claims on behalf of of hundreds of class members. *See id.* ¶ 21.

*2. Typicality*

For claims raised by putative class representatives to be "typical," they must "reasonably be expected to be raised by members of the proposed class. . . . Typicality does not mean that the claims of class members must be identical." *Karofsky*, 1997 Me. Super. LEXIS 316, at *24 (citations omitted). Typicality exists where "the claims of all class members arise out of the same events and require the same legal arguments to establish liability." *Everest v. Leviton Mfg. Co.*, No. CV-04-612, 2007 Me. Super. LEXIS 111, at *5 (June 5, 2007). This requirement is "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Millett v. Atlantic Richfield Co.*, No. CV-98-555, 2000 Me. Super. LEXIS 39, at *24 (Mar. 2, 2000)

11

(quoting *Baby Neal ex rel Kanter v. Casey*, 43 F.3d 48, 57 (3rd Cir. 1994)). Moreover, "a difference in damages arising from a disparity in injuries among the plaintiff class does not preclude typicality." *Karofsky*, 1997 Me. Super. LEXIS 316, at *24.

Plaintiffs argue that their claims are typical of the class because they, like the putative class, received disconnection notices sent by CMP with what they allege was the intent to cause emotional distress. Their claims thus arise out of the same conduct as those of the putative class members. *See Everest*, 2007 Me. Super. LEXIS 111, at *6. CMP objects to both the characterization of the Disconnection Notices and this application of the "typicality" requirement, contending claims for emotional distress damages as a rule cannot be "typical." *Richman v. Possibilities Counseling Servs.*, No. BCD-CV-10-53, 2011 Me. Bus. & Consumer LEXIS 16, at *5 (July 12, 2011) (holding in its typicality analysis that "[emotional damages] claims are unique. . . and are not suitable for certification within the class action."). This Court agrees with its previous assessment. The named Plaintiffs cannot make "the same legal arguments" as the other class members because, as stated in the commonality analysis, a crucial element of their claim is evincing objectively severe emotional distress on the part of each plaintiff, a question which is unique to each individual. *Everest*, 2007 Me. Super. LEXIS 111, at *5; *accord Lyman*, 2010 ME 139, ¶ 16, 10 A.3d 707.

B. Rule 23(b)

Under Rule 23(b), in addition to the requirements of Rule 23(a), class actions are maintainable only if

12

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests, or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

> (D) the difficulties likely to be encountered in the management of a class action.

Plaintiffs assert the third criterion, that common questions of law or fact predominate over those unique to individual members and that a class action is the superior method of adjudication. This rule largely overlaps with the commonality analysis under Rule 23(a)(2). *Karofsky*, 1997 Me. Super. LEXIS 316, at *6. The

13

difference is that commonality under Rule 23(a)(2) simply requires that a question common to all members exist, whereas Rule 23(b)(3) requires that the plaintiff show such question or questions *predominate*. *Wal-Mart Stores*, 564 U.S. at 359. The aim of the predominance inquiry "is to test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.'" *In re Asacol Antitr. Litig.*, 907 F.3d 42, 51 (1st Cir. 2018) (quoting *Amgen, Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 469, 133 S. Ct. 1184 (2013)). Analyzing inefficiency means considering the pragmatic reality of taking and weighing evidence issues individual to each class member, and analyzing unfairness means considering the extent to which eliminating inefficiency via a class action would interfere with a party's rights to raise plausible individual challenges to each of those issues. *Id.* at 51-52. Any method of adjudication must be both administratively feasible and protective of defendants' Seventh Amendment and due process rights. *Id.* at 52.

Plaintiffs emphasize that the Court must look to CMP's conduct, not whether each class member has a colorable claim. They say the question for the Court at this stage is whether they have provided sufficient evidence of issues and questions common to the class, not whether the action will ultimately be successful on the merits. *See Karofsky*, 1997 Me. Super. LEXIS 316, at *12. However, this Court finds the questions of law and fact at issue not to be common to the class, negating any predominance argument.

14

Even if there were common questions, Plaintiffs' cited caselaw is unconvincing. They propose that claims for emotional damages can be efficiently heard in a class action and rely on federal cases from Connecticut for support. In *Collins v. Olin Corp.*, the court held that in an intentional infliction of emotional distress claim, proximate cause inquiry can be done in conjunction with inquiry into each plaintiff's actual damages and that the remaining elements, such as the defendant's intent, whether the defendant's conduct was likely to cause distress, and whether that conduct was extreme and outrageous, can be analyzed on a class-wide basis. 248 F.R.D. 95, 104 (D. Conn. 2008). This only partially solves the question of inefficiency, as that court would still have been forced to hear testimony on the actual damages of each of hundreds of individuals had the case not ultimately settled. *Id.* at 101. Moreover, *Collins* involved additional claims for damages alongside intentional infliction of emotional distress, such as negligence, creation of a nuisance, abnormally dangerous activity, and willful and reckless conduct, bringing into question whether it actually stands for a court's capacity to certify a class on IIED claims alone. *Id.* at 100.

Plaintiffs' citation to *Macedonia Church v. Lancaster Hotel, Ltd. P'ship* is also not helpful, because while that court held issues susceptible to generalized proof can predominate even while inherently individualized issues exist, the "key consideration" in that action was that "there was one instance of [racial] discrimination that affected the putative class members at the same time. . . as opposed to numerous instances of discrimination over time." 270 F.R.D. 107, 120-21 (D. Conn. 2010). Plaintiffs in the instant case do allege numerous instances of

intentional infliction of emotional distress over time. Additionally, that court also had to take individualized evidence from each class member, numbering more than a hundred plaintiffs. The number of class members in the instant action remains unclear but is likely to far exceed that number. Regardless, CMP correctly notes that both of those cases were decided prior to *Wal-Mart Stores*, which raised the bar for showing predominance at class certification, and Plaintiffs have not shown how a common question in the context of intentional infliction of emotional distress can predominate over individual ones. *See* 564 U.S. at 359.

Rule 23(b)(3)(D) also requires this Court to consider the "difficulties likely to be encountered in the management of a class action." Plaintiffs propose several methods of administering the adjudication, including bifurcating proceedings into liability and damage trials, appointing a magistrate to preside over individual damages proceedings, decertifying the class after a liability trial and allowing the class members to pursue damages on their own, creating further subclasses, or otherwise altering the class. They also hope the initial, merits trial will spur an agreement with CMP on compensation, rendering questions of case management moot. First, Plaintiffs' suggestions do not effectively overcome the difficulties inherent in this action. The expert testimony offered by Plaintiffs, taken as true, demonstrates only that emotional distress may reasonably be *expected* on the part of low-income CMP customers who receive notices threatening immediate disconnection, not that such emotional distress did in fact occur. But CMP has the right to require each plaintiff, whose numbers are amorphous at best, to prove actual

16

injury; the elements of intentional infliction of emotional distress cannot be bifurcated because CMP is only liable if all four factors have been proven. A trial only on the first two elements, i.e. CMP's intent in sending the disconnection notices and the outrageousness of said notices, could not result in an enforceable judgment and would require the Court to call each of the several hundred or class members to individually testify on questions of causation and the severity of his or her distress. Such a "liability trial," as Plaintiffs term it, could at most result in a finding of "potential liability." Second, this Court will not certify an unmanageable class action on the assumption, well-founded or not, that the suit will not proceed to a merits trial.

## CONCLUSION

Based on the foregoing, the entry will be: Plaintiffs' motion for class certification is DENIED.

SO ORDERED.

Date: **4/4/2022**

_____
M. Michaela Murphy, Justice
Business & Consumer Court

Entered on the docket: 04/05/2022

17

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER
DOCKET
Location: Portland
DKT. NO. BCD-CV-20-20

BRETT DEANE, *et al.*,                )
                                       )
    Plaintiffs,                        )
                                       )       **ORDER ON DEFENDANT'S**
v.                                     )       **MOTION TO DISMISS**
                                       )
CENTRAL MAINE POWER                    )
COMPANY,                               )
                                       )
    Defendant.                         )

Defendant Central Maine Power Company ("CMP") filed a motion to dismiss Plaintiffs'[1]

Corrected Second Amended Complaint ("SAC") for failure to state a claim.[2] The SAC alleges

several claims that arise from CMP's use of ostensibly misleading disconnection notices issued to

its residential customers in the winter months. Plaintiffs, as proposed representative class

plaintiffs, seek to have this certified as a class action. The Court has reviewed all briefing, relevant

law, and considered the parties' arguments from the hearing held on October 23, 2020. It issues

the following decision.[3]

## LEGAL STANDARD

"A motion to dismiss tests the legal sufficiency of the complaint, the material allegations

---

[1] The individual plaintiffs in this matter are Brett Deane, Henry Lavender, Joleen Mitchell, Pauline Nelson, and Susan Solano.

[2] The Court disagrees with Plaintiffs' contention that CMP's motion relies on facts outside the pleadings. CMP simply pointed to the absence of certain factual allegations, which is wholly permissible on a motion to dismiss for failure to state a claim.

[3] While the motion to dismiss was under advisement, three additional proposed plaintiffs sought intervention in the case based on revised disconnection notices they received in November 2020. These proposed intervenors also requested this Court issue a temporary restraining order or preliminary injunction prohibiting CMP from using putatively misleading disconnection notices during the winter. The Court will address those issues in a separate order after it has been fully briefed.

1

of which must be taken as admitted . . . ." *Packgen, Inc. v. Bernstein, Shur, Sawyer & Nelson, P.A.*, 2019 ME 90, ¶ 16, 209 A.3d 116 (citations omitted).  While the Court must accept as true all well-pleaded factual allegations in the complaint, it is "not bound to accept the complaint's legal conclusions." *Bowen v. Eastman*, 645 A.2d 5, 6 (Me. 1994) (citing *Robinson v. Washington Cnty.*, 529 A.2d 1357, 1359 (Me. 1987)).  "A dismissal is only proper when it appears beyond doubt that [the] plaintiff is entitled to no relief under any set of facts that [it] might prove in support of [its] claim." *Packgen*, 2019 ME 90, ¶ 16, 209 A.3d 116 (alterations in original).

A complaint only needs to consist of a short and plain statement of the claim to provide fair notice of the cause of action. *Johnston v. Me. Energy Recovery Co., Ltd. P'ship*, 2010 ME 52, ¶ 16, 997 A.2d 741.  While Maine is a notice pleading state, that does not mean a plaintiff can "proceed on a cause of action if that party's complaint has failed to allege facts that, if proved, would satisfy the elements of the cause of action." *Burns v. Architectural Doors & Windows*, 2011 ME 61, ¶¶ 16-17, 19 A.3d 823.  Thus, the plaintiff must "allege facts sufficient to demonstrate that [she] has been injured in a way that entitles . . . her to relief." *Id.* ¶ 17.  When it comes to allegations of fraud, the law requires a plaintiff to plead those allegations with particularity.  *See Ramsey v. Baxter Title Co.*, 2012 ME 113, ¶ 6, 54 A.3d 710; *Bean v. Cummings*, 2008 ME 18, ¶ 8, 939 A.2d 676; M.R. Civ. P. 9(b).

## ALLEGATIONS

The following are the allegations made by Plaintiffs.  Plaintiffs Deane, Lavender, Mitchell, Nelson, and Solano are residential customers of CMP living in various parts of the State.  (Pl.s' SAC ¶¶ 31-35, 39, 44, 53, 58, 65-66.)  Each received notice(s) from CMP either in 2019 or early 2020 threatening disconnection if payment was not made.  (Pl.s' SAC ¶¶ 40-41, 46-47, 53-54, 59, 61, 66, 70.)  Plaintiffs claim that receiving these notices under the perceived threat of losing their

2

power in the winter months caused extreme distress to each of the Plaintiffs. (Pl.s' SAC ¶¶ 43, 50, 52, 57, 60, 63, 68, 72, 74.) The relevant background of Plaintiffs' complaint revolves around the prohibition against disconnecting residential customers' electricity during winter months without securing the requisite approvals first and CMP's related disconnection notices.

CMP transmits and delivers electricity to more than 624,000 customers in an 11,000-square-mile area in Maine. (Pl.s' SAC ¶ 6.) It bills its residential customers for the transmission and distribution services, and bills for electric power purchased by these customers, whether pursuant to the "Standard Offer" or contracts with purveyors of electric power transmitted and distributed by CMP. (Pl.s' SAC ¶ 7.) CMP retains the right to disconnect its service and stop the provision of electricity to customers who fail to pay bills rendered by CMP for transmission and distribution services rendered and electric power supplied, if allowable under the rules governing such practices. (Pl.s' SAC ¶ 8.) As a public utility subject to regulation by the Maine Public Utilities Commission ("PUC" or the "Commission"), it is required to abide by rules promulgated by the PUC in many of its practices, including its disconnection practices. (Pl.s' SAC ¶ 8.)

The PUC has promulgated rules governing CMP as well as other Maine gas and electric public utilities that regulate many aspects of the disconnection procedure and forbid disconnection in certain cases. (Pl.s' SAC ¶ 9.) These rules are collected at Chapter 815, Section 10 of the Maine Code of Administrative Regulations. (Pl.s' SAC ¶ 9.) Since 2008 the PUC has had in effect certain special rules that restrict and govern the right of CMP to disconnect customers during a "Winter Disconnection Period" extending from November 15 to April 15 in each year (Chapter 815, Section 2(GG)), used in order to protect vulnerable consumers from potentially severe hardship caused by loss of electricity during the winter months (the "Winter Disconnection Rules")). (Pl.s' SAC ¶ 9.) These rules are set forth at Section 10(M) of Chapter 815 and provide

3

in pertinent part as follows:

> M. Winter disconnection of residential customers
> [. . .]
> 2. Failure to make personal contact with customer
> [. . .]
> b. Occupied premises. If the utility is unable to make personal contact with the customer after at least one visit to the residential unit and is uncertain after an on-site inspection whether the unit is inhabited, the utility shall provide a written Notice of Customer Rights by first class mail to the last recorded billing address of the customer. This Notice shall be accompanied by a warning that if a response is not received by the utility within five business days, the utility may either seek permission to disconnect from the [Consumer Assistance and Safety Division ("CASD" or "CAD")] or may cycle disconnect the customer pursuant to paragraph 3 below. If a response is received within five business days after the receipt date of the mailing, the utility shall proceed in accordance with the requirements of Section 9(F)(5). If no response has been received by the utility within five business days after the receipt date of the mailing or the mailing is returned to the utility undelivered, the utility may seek permission to disconnect from the CASD pursuant to paragraph 4 below or may cycle disconnect pursuant to paragraph 3 below.
> [. . .]
> 4. CASD permission required to disconnect in winter
>
> a. During the Winter Disconnection Period, a utility may not disconnect any customer except in one of the following circumstances and only after it has received the authorization of the CASD:
>
> > i. The customer rejects the opportunity to make a payment arrangement, if applicable, or does not agree to the terms specified by the CASD.
> > ii. The customer fails to comply with the terms of a second or subsequent Special Payment Arrangement or the terms of any other payment arrangement, if applicable.
> > iii. The utility is not able to make contact with the customer as specified in Section 10(M)(2) above.
>
> b. Any utility seeking to disconnect a customer shall submit its request including all supporting reasons in writing and send a copy to the customer. The CASD will render its decision as soon as possible, which decision shall be confirmed in writing. In making a

> decision with respect to such authorization, the CASD shall consider the individual circumstances of the customer, including the customer's efforts with respect to communication and cooperation with the utility and the CASD, ability to pay, need for utility service during the Winter Disconnection Period, and compliance with the provisions of previous Special and Regular Payment Arrangements and shall also consider the utility's compliance with the requirements of this subsection with respect to the customer. In denying a request to disconnect, the CASD may set the terms for a payment arrangement for the customer.

(Pl.s' SAC ¶ 9.)

The purpose of Section 10(M)(4) is to ensure that CMP's decision to disconnect an existing residential customer during the winter season, when disconnection could have drastic effects on the customer's health and very survival, has been reviewed by the CAD of the Commission to determine whether such disconnection should be allowed under the criteria set forth in subsection (10)(M)(4)(b) above and that the customer has a last opportunity to appeal to the CAD for relief from the disconnection before it takes place. (Pl.s' SAC ¶ 10.) Among the purposes of Section 10(M)(2) is to ensure that customers are fully informed of what they need to do to avoid disconnection and when the earliest date their power can be disconnected if they don't contact CMP, as well as to identify CMP's duty to customers who contact CMP within five business days of a customer's receipt of the Notice of Customer Rights. (Pl.s' SAC ¶ 11.)

It is CMP's customary practice to conduct a premises visit and simultaneously deliver to the customer the Notice of Customer Rights only after the stated "disconnection date" on the disconnection notice CMP previously sent to the customer has passed without the customer satisfying CMP. (Pl.s' SAC ¶ 12.) Thus, CMP knows the recipient of CMP's Notice of Customer Rights and other communications described has previously been told that their electric service was scheduled for disconnection. (Pl.s' SAC ¶ 13.) Throughout CMP's disconnection process, that is, its use of its winter disconnection communications, CMP intends for the customer to believe the

5

customer must pay their account balance in full or enter into a payment arrangement plan that CMP dictates in order to avoid unilateral disconnection, which does cause customers to make immediate payments in order to avoid disconnection. (Pl.s' SAC ¶¶ 14-15.) CMP's form disconnection notice described above is the same form CMP utilizes year-round, including the non-winter months where CMP does possess and exercise its authority to disconnect service when customers do not satisfy CMP prior to the stated disconnection date on said notice. (Pl.s' SAC ¶ 16.)

Plaintiffs allege that these disconnection notices and other communications to its customers regarding disconnection of their services during the Winter Disconnection Period subject to Chapter 815, Subsection 10(M) deceptively fail to inform the customers to whom such communications were directed that the threatened disconnection can only take place with the consent of the CAD, and thus give the misleading impression that the customers will be disconnected without recourse at the sole discretion of CMP. (Pl.s' SAC ¶ 17.) Plaintiffs further allege that these notices purposely deprive the customer of information she is entitled to as part of a strategy to impose emotional distress and force a customer to make payment as soon as possible, irrespective of what the Chapter 815 regulations require. (Pl.s' SAC ¶ 18.) Plaintiffs contend CMP's intent is evidenced through, among other things, (i) CMP's prior efforts to obtain Commission approval for use of certain language in its winter disconnection notices and its actions in response thereto, (ii) the express language used in CMP's notices and letters, and (iii) the language CMP is required to use but which CMP omits. (Pl.s' SAC ¶ 20.)

By letter dated February 22, 2015, Susan E. Cottle, then the Deputy Director of the CAD, warned CMP that the following statement CMP was then including in its Notice of Customer Rights form was contrary to the Chapter 815 regulations: "Failure to contact us may result in disconnection of your electric service. Approval of the Consumer Assistance Division of the

Maine Public Utilities Commission is not required." (Pl.s' SAC ¶ 21.) On October 7, 2015, just prior to the commencement of the 2015/2016 Winter Disconnection Period, CMP submitted to the PUC a request for waiver from the requirement to use the verbatim language of Appendix A to Chapter 815 "and instead use a modified version that still complies with the intent and requirements of Sections 10(M)(5)(b) and (6)." (Pl.s' SAC ¶ 22.) Attached to its request for waiver was CMP's proposed new Notice of Customer Rights form. (Pl.s' SAC ¶ 23.) CMP's requested modifications to the form Notice of Customer Rights the Chapter 815 regulations require included eliminating language referencing the availability of a Special Payment Arrangement, and also included the same language quoted above which the CAD warned CMP in February 2015 was not allowed. (Pl.s' SAC ¶ 24.) Noticeably absent from CMP's request and explanation as to how their proposed new form Notice of Customer Rights differed from Appendix A but yet still complied with the Chapter 815 regulations, was CMP's inclusion of the language CMP was warned in February 2015 that it could not use. (Pl.s' SAC ¶ 25.)

In response to the waiver request, Susan Cottle emailed Ann Brooks on October 8, 2015, to inform her that "as written, the request will not be granted" since the language of concern was "problematic" and "not only different from what is in Appendix A, it is in direct contradiction to Section 10(M)(4)(a)." (Pl.s' SAC ¶ 26.) CMP then revised its request to eliminate the problematic language from its proposed new Notice of Customer Rights. (Pl.s' SAC ¶ 27.) This request was granted. (Pl.s' SAC ¶ 27.) CMP then removed the problematic language from its Notice of Customer Rights, but that has not stopped CMP from threatening customers in writing with this language tens of thousands of times over the subsequent four Winter Periods with clear knowledge of the impropriety of doing so. (Pl.s' SAC ¶ 28.)

CMP has utilized two other types of disconnection notices since at least the commencement

of the 2015/2016 Winter Disconnection Period, which CMP calls its "PV Notice" and its "Letter 180." (Pl.s' SAC ¶ 29.) The PV Notice and Letter 180 were self-created by CMP and have been used abusively as part of CMP's winter disconnection process in order to impose maximum pressure and emotional upset on the customer to make immediate payment to CMP. (Pl.s' SAC ¶ 29.) CMP has utilized its PV Notice and Letter 180 in a manner that obfuscates and directly misstates the winter disconnection process mandated by Chapter 815 to the detriment of the customer, in part by incorrectly stating to the customer that if they fail to contact CMP, CMP can disconnect their electric service during the winter months without the approval of the Commission. (Pl.s' SAC ¶ 30.)

## ANALYSIS

On the basis of the above allegations, Plaintiffs bring claims for fraud (one requesting legal relief and one requesting "equitable relief" in the form of CMP returning to Plaintiffs payments made in response to the disconnection notices), negligent misrepresentation, what purports to be a statutory claim under 35-A M.R.S. § 1501, a claim for violation of the Maine Unfair Trade Practices Act ("MUTPA"), and a claim for intentional infliction of emotional distress ("IIED").[4] CMP raises a broad argument for dismissal of all six claims for relief, namely that Plaintiffs have not alleged facts supporting cognizable harm. CMP also raises alternative arguments for dismissal of the "equitable relief" fraud claim, the section 1501 claim, and the IIED claim.

1. Counts I through V

CMP argues for dismissal of all claims due to the lack of allegations of cognizable harm. One of the arguments for this is that emotional distress is not a cognizable harm when the underlying alleged wrongdoing is misrepresentation. This would seemingly apply to the IIED

---

[4] Plaintiffs also included a request for punitive damages.

claim as well as all other claims. As the Court will discuss in the next section, however, it does not view the alleged underlying tort being a misrepresentation as precluding the IIED claim. Therefore, the Court covers only Plaintiffs' first five claims (both variations of fraud, negligent misrepresentation, violation of section 1501, and violation of MUTPA) in this section.

The Court concludes that CMP's primary argument is dispositive of all claims other than the IIED claim, and therefore requires dismissal of Count I (fraud), II ("equitable relief" fraud), III (negligent misrepresentation), IV (violation of section 1501), and V (violation of MUTPA). This argument is that none of the Plaintiffs make any allegations regarding pecuniary harm. Specifically, CMP points out that three Plaintiffs (Deane, Lavender, and Mitchell) do not allege making any payments at all in response to the disconnection notices. Instead, Plaintiffs broadly allege "that CMP customers have made burdensome payment decisions that they would not have made were they accurately informed about the requirement that CMP obtain CAD consent to proposed disconnections . . . ." (Pl.s' SAC ¶ 19.) Nonetheless, in order to state claims for relief, Plaintiffs must "allege facts sufficient to demonstrate that [they] ha[ve] been injured in a way that entitles . . . [them] to relief." *Burns*, 2011 ME 61, ¶ 17, 19 A.3d 823. This is especially clear with the fraud, negligent misrepresentation, and MUTPA claims, each of which can only survive this stage upon allegations of a *financial* loss.[5]

---

[5] For this reason, Plaintiffs' allegations of harm in the form of the disconnection notices causing them to be "unable to raise questions and defenses to CMP's charges" are not sufficient to constitute cognizable harm. (Pl.s' SAC ¶ 89.) Moreover, even if 35-A M.R.S. § 1501 were deemed to be a stand-alone cause of action, the Court does not believe it could permit recovery for anything other than pecuniary harm. Thus, the requirement of pecuniary harm is as relevant to the section 1501 claim as it is to the fraud, negligent misrepresentation, and MUTPA claims. As CMP notes, freestanding emotional distress damages are particularly circumscribed in Maine law and rarely available. *See, e.g.*, *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 15, 711 A.2d 842 (requiring "atrocious" and "utterly intolerable" conduct for IIED claims). If the Legislature had intended to create an avenue to circumvent Maine's limitation on freestanding emotional distress damages, it would have said so clearly. *Cf. Fuhrmann v. Staples the Office Superstore E., Inc.*, 2012 ME 135, ¶ 34, 58 A.3d 1083 ("If the Legislature had intended to create individual supervisor liability it would have done so explicitly in much clearer terms.").

In Maine, in order to sufficiently plead a fraud claim, a plaintiff must allege (under M.R. Civ. P. 9(b)'s more stringent standard) the following facts: (1) a party made a false representation; (2) the representation was of a material fact; (3) the representation was made with knowledge of its falsity or in reckless disregard of whether it was true or false; (4) the representation was made for the purpose of inducing another party to act in reliance upon it; and (5) the other party justifiably relied upon the representation as true and acted upon it to the relying party's damage. *Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280 (citing *Flaherty v. Muther*, 2011 ME 32, ¶ 45, 17 A.3d 640); *see generally Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me. 1987) ("[P]ecuniary loss is an essential element of a fraud action and . . . damages for emotional or mental pain and suffering are not recoverable."); 2 Harvey & Merritt, *Maine Civil Practice* § 9:2 at 384 (3d, 2011 ed.) (emphasis added) ("The misrepresentation itself, including its materiality, the reliance thereon *and the damages resulting therefrom*, must be set forth with particularity."). Next, in order to plead a claim for a violation of MUTPA, a complaint must contain facts sufficient to show the Plaintiffs (1) purchased services (2) primarily for personal use and (3) suffered monetary loss (4) caused by (5) an unfair or deceptive trade practice. *See* 5 M.R.S. § 213(1); *see generally Tungate v. MacLean-Stevens Studios, Inc.*, 1998 ME 162, ¶ 13, 714 A.2d 792 (quotation marks omitted) ("To be entitled to the remedial measures authorized by the UTPA, the [plaintiffs] must show a loss of money or property as a result of the UTPA violation."). Lastly, the tort of negligent misrepresentation is defined as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for *pecuniary loss* caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990) (emphasis added) (quoting Restatement (Second) of Torts § 552(1) (1977)).

Here, none of the Plaintiffs allege any harm even approaching pecuniary harm. Most crucially, Plaintiffs set the bar high for the allegations of damages by bringing a fraud claim, which, as noted above, requires stating damages suffered in reliance on the misrepresentation with particularity. Though the negligent misrepresentation and MUTPA claims are not subject to heightened pleading, there would be a practical trickle-down effect from the damages allegations for fraud to the damages allegations for negligent misrepresentation and MUTPA because all require allegations of pecuniary harm. Conversely, the fact that Plaintiffs do not allege any form of pecuniary harm under even an unheightened pleading standard is particularly fatal to the fraud allegations.

In opposition to CMP's motion, Plaintiffs point to several specific paragraphs of the current iteration of the complaint. Two allege specific acts of payment:

- "In direct response to and in reliance upon these threats of immediate and unilateral disconnection, Plaintiff Nelson entered into a payment arrangement with CMP, wherein she agreed to pay $60.00 per month toward her outstanding balance in addition to her monthly usage." (Pl.s' SAC ¶ 62); and

- "Plaintiff Solano made payment to CMP in the amount of $235.03 on January 13, 2020, which was the amount cited in the disconnection notice as the 'Amount to stop disconnection' in direct response to and in reliance upon CMP's misrepresentations and threats of imminent disconnection." (Pl.s' SAC ¶ 69).[6]

---

[6] Though not pointed to in opposition by Plaintiffs, Plaintiff Solano alleged making an additional payment to CMP: "Plaintiff Solano made payment to CMP in the amount of $315.25 on February 11, 2020, which was the amount cited in the disconnection notice as the 'Amount to stop disconnection' in direct response

11

Otherwise, Plaintiffs point to the general recitation of elements of each claim.[7] (Pl.s' SAC ¶¶ 88, 99, 106, 112.)

Notably lacking from even the most generous readings of any portion of the complaint are allegations that any Plaintiffs paid money they did not owe based on these notices.[8] Plaintiffs Nelson and Solano do at least allege making payments in response to the notices, but neither alleges the amounts owed were wrong in any way. Neither side pointed the Court to a Maine case on the issue of whether payment of a presumably valid debt in response to allegedly deceiving notices could constitute pecuniary harm. CMP did point to two cases from other jurisdictions supporting the notion that payment of an otherwise valid debt is not a type of pecuniary harm. The Court finds to be logically sound the proposition that paying a debt owed is not pecuniary harm. *See Moritz v. Daniel N. Gordon, P.C.*, 895 F. Supp. 2d 1097, 1116-17 (W.D. Wash. 2012) (reviewing caselaw and concluding "that Ms. Moritz cannot recover the amounts she paid to DNG because those amounts were less than the total amount she owed to CACV on a valid debt"); *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1406, 48 Cal. Rptr. 3d 770, 779 (2006)

---

to and in reliance upon CMP's misrepresentations and threats of imminent disconnection." (Pl.s' SAC ¶ 73.)

[7] The Court does not see rote recitation of general damages allegations to be sufficient in the context of this case where Plaintiffs Solano and Nelson make specific allegations of payment in response to the notices. This is particularly so when it comes to alleging damages for fraud. *See Ramsey v. Baxter Title Co.*, 2012 ME 113, ¶ 7, 54 A.3d 710 (finding inadequate "merely recit[ing] in conclusory fashion the elements of a fiduciary relationship," i.e., another claim subject to heightened pleading). Notwithstanding other deficiencies that are fatal to the claims highlighted above, there does not appear to be any reason why Plaintiffs Deane, Lavender, and Mitchell could not have made such specific allegations regarding payment in response to notices had they made such payments.

[8] Plaintiffs' opposition appears to posit that the bills *may* have been inaccurate: "The named Plaintiffs . . . strongly dispute the accuracy of CMP's metering and billing," and "It is plausible that these Plaintiffs did not actually owe all that was being demanded of them." (Pl.s' Opp. 1 n.1 & 10.) Moreover, during the hearing, Plaintiffs' counsel stated he believed the complaint contained allegations regarding the inaccuracy of Plaintiffs' bills, but the Court could not find any in the complaint. Assertions in briefs and at hearing are not allegations in the complaint, which is lacking any allegations that Plaintiffs were billed improper amounts or paid amounts not actually owed in response to disconnection notices.

12

("Since Camacho was liable for the damages arising from the accident, it does not violate his rights to attempt to collect those damages. In other words, he was not injured."). *But see McMahon v. LVNV Funding, LLC*, 301 F. Supp. 3d 866, 882 (N.D. Ill. 2018) ("The Court agrees with plaintiff that the amount class members paid as a result of receiving deceptive dunning letters is at least a permissible measure of damages under the FDCPA, and it may well be a proper measure of damages in this case.").

Plaintiffs do contend in general recitations of claims that "their funds were misdirected," (E.g., Pl.s' SAC ¶ 89), but this does not state any sort of pecuniary harm. Had Plaintiffs alleged, for example, that these purportedly deceptive notices caused them immediately to pay CMP because they thought they had no other option, and they then lacked funds to pay their mortgages and the bank foreclosed on the mortgages and secured deficiency judgments as a result, then they would have a stronger argument that they alleged pecuniary harm because their funds were misdirected. Yet, the complaint contains nothing of the sort. Simply stating "funds were misdirected" does not automatically equate to allegations of pecuniary harm.

Because Plaintiffs did not allege for Counts I through V any facts to state they suffered cognizable harm, these claims must be dismissed. Even if this were not enough, the Court agrees with CMP that Plaintiffs' repurposing of the fraud claim in Count II to request the return of payments made as "equitable relief" does not state a claim for relief beyond that in Count I (which, as discussed, must be dismissed). "Where a plaintiff seeks damages as full compensation for an injury, the claim is legal . . . ." *DesMarais v. Desjardins*, 664 A.2d 840, 844 (Me. 1995) (citation omitted) (quotation marks omitted). On the other hand, equitable claims are "those requiring creative, injunctive, or unique action by the court . . . ." *Thermos Co. v. Spence*, 1999 ME 129, ¶ 18, 735 A.2d 484. Asking for money damages as a form of "equitable relief" is inherently

13

contradictory unless the claim is for rescission of the transaction. As CMP notes, however, it would be impossible for Plaintiffs to return electricity used which therefore means Plaintiffs are not seeking a rescission of the transaction. Because the essence of fraud is pecuniary harm (i.e., money damages), *Jourdain*, 527 A.2d at 1307, Count II does not state a claim for relief. Additionally, the Court does not view 35-A M.R.S. § 1501 as providing a freestanding cause of action. It simply confirms that individual persons are not deprived of pursuing common law causes of action if they are harmed by a utility's violation of title 35-A. Otherwise, the Law Court's footnote in *Smith* would be superfluous: "By statutes and by common law, violation of a safety statute or regulation may be evidence of negligence but does not constitute negligence per se. *See* 35-A M.R.S. §§ 1501, 2305-A(1)(C), (2), (5) (2009); *Castine Energy Constr., Inc. v. T.T. Dunphy, Inc.*, 2004 ME 129, ¶ 10, 861 A.2d 671, 675; *French v. Willman*, 599 A.2d 1151, 1152 (Me. 1991)." *Smith v. Cent. Me. Power Co.*, 2010 ME 9, ¶ 10 n.3, 988 A.2d 968.

For the foregoing reasons, Counts I through V must be dismissed.

2. The IIED claim

As the Court noted above, it does not view the alleged underlying tort being a misrepresentation as precluding the IIED claim. There are two reasons for this. First is the case in which the Law Court vacated a dismissal of an IIED claim in an action involving numerous misrepresentations by the defendant. *See Rubin v. Matthews Int'l Corp.*, 503 A.2d 694, 700 (Me. 1986) ("Although Matthew's misrepresentations in this case were not so extensive, given the allegations of repeated misrepresentation of a timely delivery of the monument for the unveiling ceremony and the circumstances in which they were made, we conclude that the complaint states a cause of action for intentional infliction of emotional distress."). Second is Justice Hjelm's sound and persuasive analysis in a Superior Court decision issued on a closely analogous issue. In that

14

case, the defendant "argue[d] that [the plaintiff] may not maintain an action for IIED in count 3, because the latter claim has the same factual basis as the misrepresentation claim, and because she cannot recover non-pecuniary damages for misrepresentation, she cannot recover them for IIED." *Wood v. Patrons Oxford Mut. Ins. Co.*, No. CV-03-238, 2004 Me. Super. LEXIS 137, at *12 (June 30, 2004). Though Justice Hjelm noted that the "argument enjoy[ed] superficial support in Maine law," he focused on the fact that "'*any person may be liable* for the infliction of emotional distress if the conduct causing the harm is sufficiently outrageous and is intentional or reckless . . . .'" *Id.* at *12-13 (quoting *Curtis v. Porter*, 2001 ME 158, ¶ 17, 784 A.2d 18). He ultimately concluded that the "claim for non-pecuniary damages is not foreclosed as a matter of law because of any identity of factual allegations between her claims for misrepresentation and IIED." *Id.* at *13. The Court does not view *Veilleux* as binding on this point because it did not involve an IIED claim. *See Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 130 (1st Cir. 2000). Therefore, the Court proceeds to determine whether, as a matter of law, Plaintiffs have alleged conduct sufficiently extreme and outrageous for the IIED claim to withstand the motion to dismiss.

Simply put, though it is a close call, taking Plaintiffs allegations as true (including the disconnection notices attached to the complaint) as the Court must at this stage, the Court concludes Plaintiffs have alleged enough. In order to withstand a motion to dismiss for failure to state an IIED claim, Plaintiffs must allege facts regarding the following elements:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable [person] could be expected to endure it.

15

*Curtis*, 2001 ME 158, ¶ 10, 784 A.2d 18 (quotation marks omitted). "The determination of whether the facts alleged are sufficient to establish that the defendant's conduct is 'so extreme and outrageous to permit recovery' is a question of law for the court to decide." *Argereow v. Weisberg*, 2018 ME 140, ¶ 27, 195 A.3d 1210. The parties directed the Court to federal court cases they viewed as being factually analogous, but the Court chose to canvas Law Court cases to determine what conduct has and has not been deemed sufficiently extreme and outrageous in order to determine where Plaintiffs' allegations here fall on that spectrum. While not every case discussed herein was decided at the 12(b)(6) stage, the Court nonetheless views them as relevant to consider because they help inform the question of law regarding what level of conduct can be enough to proceed on an IIED claim.

Two cases in which the Law Court viewed the conduct at issue to be insufficient are *Argereow*, 2018 ME 140, 195 A.3d 1210, and *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, 711 A.2d 842. In *Argereow*, the plaintiff alleged that she was a former employee at one of Weisberg's medical offices and that Weisberg communicated negative information to someone at Mercy Hospital when the plaintiff was set to begin employment there, which resulted in Mercy suggesting she withdraw her application. 2018 ME 140, ¶¶ 3-8, 195 A.3d 1210. The Law Court concluded that the plaintiff's allegations "that Mercy acted on Weisberg's report concerning her professional qualifications and performance, where he suggested that she was professionally incompetent, by encouraging her to withdraw her employment application . . . [, a]s a matter of law, . . . falls short of the standard for actionable conduct necessary for a claim for intentional infliction of emotional distress." *Id.* ¶ 28. In *Champagne*, the plaintiff was a mother who gave birth to a son at the hospital; a nursing student mistakenly took the child to a different maternity patient who breastfed the child for three to five minutes before anyone realized it was the wrong

16

mother; no adverse effects to the child were reported; and plaintiff-mother did not see any of this occur. 1998 ME 87, ¶ 2, 711 A.2d 842. The Law Court saw no error in the trial court's grant of summary judgment based on the lack of extreme and outrageous conduct:

> It is undisputed that Hutchins brought Makita to a maternity patient who was not his mother; that Makita was permitted to nurse from the maternity patient for three to five minutes; that Makita was returned promptly and unharmed to the nursery when the error was discovered; and that Champagne was notified of the incident about one hour after it occurred. Such conduct, while troubling and unfortunate, cannot be characterized as "so extreme and outrageous as to exceed all possible bounds of decency in a civilized community."

*Id.* ¶ 16. Neither of these cases involved anything close to—as alleged here—the deceptively misleading actions meant to invoke emotionally distressed reactions over an individual or family's functional livelihood in the harsh Maine winter months.

On the other hand, the Court reviewed two Law Court IIED cases that contain factors more relevant to the present action. Those two cases are *Rubin v. Matthews Int'l Corp.*, 503 A.2d 694 (Me. 1986), and *Bratton v. McDonough*, 2014 ME 64, 91 A.3d 1050. In *Rubin*, the plaintiff ordered a memorial stone for her mother's grave from the defendant and the defendant was aware of the religious significance of the memorial stone. 503 A.2d at 696. The defendant repeatedly reassured the plaintiff that it had shipped, and that it would arrive before the ceremony, even though the defendant instead shipped it only five days before the ceremony and the stone did not arrive in time. *Id.* The trial court had granted the defendant's 12(b)(6) motion to dismiss because it did not view the conduct as sufficiently extreme and outrageous, but the Law Court determined otherwise:

> Where reasonable men may differ, it is for the jury, subject to the control of the Court, to determine whether, in a particular case, the conduct has been sufficiently extreme and outrageous to result in liability. . . . [G]iven the allegations of repeated misrepresentation

17

> of a timely delivery of the monument for the unveiling ceremony and the circumstances in which they were made, we conclude that the complaint states a cause of action for intentional infliction of emotional distress. *See* Restatement (Second) of Torts § 46 comment d, at 73. Our conclusion draws further support from the alleged contractual nature of the relationship between the parties. *See* D. Givelber, *The Right to Minimum Social Recovery and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct*, 82 Col. L. Rev. 42, 69 (1982) (courts most likely to recognize a claim of outrageousness when the parties are "apparently bound by contracts regulating an economic relationship"). Thus, the allegations of this complaint sufficiently set forth conduct upon which liability for intentional infliction of emotional distress may be predicated.

*Id.* at 699-700. The Court finds two aspects of *Rubin* particularly noteworthy. First is the circumstance of the knowing misrepresentations by the defendant. Second is the Law Court's citation regarding outrageousness being more likely to be found when parties are bound by contracts regulating an economic relationship, such as the relationship between CMP and its customers to whom it provides electricity in exchange for money. For these reasons, the Court sees this case as relevant here.

Further, in *Bratton*, the trial court had granted judgment as a matter of law at a trial to a landlord because it concluded the following was not sufficiently extreme and outrageous:

- Plaintiffs (adults and their minor children) rented a house from the defendant-landlord in which they were exposed to lead paint (evidenced by the blood of children having elevated levels of lead);

- The landlord originally denied that the paint had lead, which led to plaintiffs continuing to live in the home;

- Plaintiffs then had a third child who was born while living there with elevated lead levels in blood, which prompted DHHS to become involved at this point, test the paint, and determine the presence of lead; and,

18

- The landlord was statutorily required to relocate the plaintiffs to another residence, but he refused to pay for it which prevented it from happening for several months; the plaintiffs were forced to continue to live in the lead-laden house.

2014 ME 64, ¶¶ 2-4, 91 A.3d 1050. The Law Court concluded it was error for the trial court to grant judgment as a matter of law:

> Viewed in the light most favorable to the plaintiff, the evidence shows that McDonough allowed a family with young children to live in a house that exposed the children to toxic levels of lead for several years. It further shows that, even after the house had been declared a lead hazard by the State and although McDonough had a legal duty to relocate the Brattons, he failed to do so for four months. We cannot say as a matter of law that no reasonable juror could find McDonough's actions extreme and outrageous.

*Id.* ¶ 23. While the conduct in *Bratton* was more extreme and outrageous than the conduct alleged here because it tangibly affected the health and safety of the plaintiffs (whereas here CMP's alleged conduct instilled fears of health and safety effects), it is not irrelevant to the Court's consideration. This is particularly so when the circumstances in both situations revolve around an indispensable necessity in life: functional shelter.

Here, Plaintiffs allege that CMP—despite knowing the Consumer Assistance Division of the Maine Public Utilities Commission did not approve of language in disconnection notices stating that the CAD or PUC's approval was not needed to disconnect in winter—continued to send notices out containing such language, as evidenced by several of the exhibits attached to the complaint and the allegations in paragraphs 40-41, 46, 54, and 59. According to the allegations in the complaint, these notices were sent essentially to compel CMP's customers into paying money before it may otherwise have been necessary to pay. Plaintiff Solano is the only one who does not allege receiving such a notice, but she does allege that the notice did not contain information that makes the other notice misleading in a different context. In other words, she alleges that the notice

19

did not indicate to her that CAD's approval was necessary to disconnect which, though not as misleading as notices stating CAD's approval was not necessary, still has the overwhelmingly negative effect as alleged by Plaintiffs in the complaint. When the foregoing is considered in the context of an existential necessity in the Maine winter months, the Court cannot say Plaintiffs have failed to allege conduct that is sufficiently extreme and outrageous. *Cf. Colford v. Chubb Life Ins. of Am.*, 687 A.2d 609, 616 (Me. 1996) (alteration omitted) (quotation marks omitted) ("Where reasonable people may differ, it is for the jury . . . to determine whether, in a particular case, the conduct has been sufficiently extreme and outrageous to result in liability."). Therefore, CMP's motion to dismiss the IIED claim is denied.

## CONCLUSION

As the Court has detailed, Count I (fraud), II ("equitable relief" fraud), III (negligent misrepresentation), IV (violation of section 1501), and V (violation of MUTPA) must be dismissed due to a failure to allege cognizable harm. On the other hand, the Court denies the motion to dismiss regarding the IIED claim.

The entry is:

1. Defendant's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.
2. The following counts are dismissed: I (fraud), II ("equitable relief" fraud), III (negligent misrepresentation), IV (violation of section 1501), and V (violation of Maine Unfair Trade Practices Act).
3. The motion is denied regarding Count VI (intentional infliction of emotional distress).
4. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated: <u>December 7, 2020</u>                    <u>/s/M. Michaela Murphy</u>
                                                 **Hon. M. Michaela Murphy**
                                                 **Justice, Maine Superior Court**

BCDWB-CV-2020-20

*BRETT DEANE, et al.*

*v.*

*CENTRAL MAINE POWER*

Party Name:                                          Attorney Name:

*Brett Deane*                                        **Cyrus Cheslak, Esq.**
*Henry Lavender*                                     Lambert Coffin
*Joleen Mitchell*                                    PO Box 15215
*Pauline Nelson*                                     Portland, ME 04112
*Susan Solano*


*Central Maine Power*                                **Gavin McCarthy, Esq.**
                                                     Pierce Atwood
                                                     Merrils Warf
                                                     254 Commercial Street
                                                     Portland, ME 04101