2010 ME 139

## Elizabeth E. LYMAN

v.

## Luke D. HUBER.

Supreme Judicial Court of Maine.

Submitted on Briefs: July 7, 2010.

Decided Dec. 28, 2010.

(2009), or marital labor, 19–A M.R.S. § 953(2)(E)(2)(b) (2009).

Jennifer A. Archer, Esq., Timothy H. Norton, Esq., Kelly, Remmell & Zimmerman, Portland, ME, for Luke D. Huber.

Paula J. House, Esq., Lake Placid, FL, for Elizabeth E. Lyman.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, GORMAN, and JABAR, JJ.

LEVY, J.

[¶ 1] Luke D. Huber appeals from a judgment entered in the Superior Court (Cumberland County, *Delahanty, J.*) following a bench trial, awarding Elizabeth E. Lyman damages totaling $106,000 for intentional infliction of emotional distress. Huber argues that the evidence was insufficient to establish two of the elements for intentional infliction of emotional distress. He also asserts that the court erred by including damages for Lyman's loss of business opportunity. Because we conclude that Lyman did not suffer emotional distress so severe that no reasonable person could be expected to endure it, we vacate the judgment.

## I. BACKGROUND

[¶ 2] We view the record in the light most favorable to Lyman as the prevailing party. *See Camden Natl. Bank v. S.S. Navigation Co.*, 2010 ME 29, ¶ 2, 991 A.2d 800, 801.

[¶ 3] Luke Huber and Elizabeth Lyman began a romantic relationship in 1991 that lasted until 2006. By the middle of 1994, the parties purchased property in Cape Elizabeth that they held as tenants-in-common. Prior to purchasing the property, Lyman had boarded three horses at the property. The property consisted of three and one-half acres and contained a barn, paddock, riding arena, trails, and a house. Lyman intended to open a horse farm where she could teach riding classes and breed horses.

[¶ 4] Lyman lived on the property full-time from the fall of 1994 until she moved out in April 2006. Huber, however, did not reside at the property full-time until late 2002 or 2003.

[¶ 5] In 1995, Huber began behaving strangely, and he became more assertive and authoritative. He accumulated piles of papers, boxes, newspapers, and trash and left them throughout the house to the point that there were only paths to get from one room to another. Despite these piles, he commanded Lyman to neither touch his things nor move his mail, and he got angry with her when she did. He would regularly yell, scream, and swear during his morning shower and stomp and kick the walls. He made hurtful comments to her regarding her body when they were being sexually intimate.

[¶ 6] Huber's behavior continued over time and escalated. He also became obsessive about taking showers, and he constantly washed his hands. He would inspect his bed and sheets with a flashlight before getting in. Moreover, sex became "dirty" to him, and he would recoil from a mere hug.

[¶ 7] Huber also became increasingly demanding of Lyman's time. He would insist that she be available when he was home. Out of fear, she cleared her schedule of social engagements and canceled lessons and appointments. She became socially paralyzed and withdrawn from her friends. Moreover, her family visited less often and when they did, she asked them not to touch Huber's things or sit in his chair.

[¶ 8] In February 2004, Lyman broke her ankle. Although Huber took her to a doctor, he left her there, and she was forced to call a friend to take her to the hospital. During her recuperation, Huber did not assist Lyman even though she could not help herself.

[¶ 9]  Huber's actions had a substantial emotional impact on Lyman.  Huber never physically abused her, but he was commanding and intimidating to the point that she feared him and his anger.  Huber's actions made Lyman feel inadequate and withdrawn.  One friend observed that she looked exhausted and stressed with dark circles under her eyes.  As the court found, family members and friends described her as "guarded, jumpy, and withdrawn," "shaken," and "tense, afraid and on edge."  In April 2006, Lyman ended the relationship and left the Cape Elizabeth property with her horses.

[¶ 10]  Lyman filed an eight-count complaint for equitable partition (Count I), waste or trespass (Count II), ouster (Count III), unjust enrichment (Count IV), quantum meruit (Count V), negligent infliction of emotional distress (Count VI), intentional infliction of emotional distress (Count VII), and punitive damages (Count VIII).  Huber's answer asserted counterclaims for declaratory judgment and unpaid loans.  Huber later moved for entry of summary judgment, and the court granted his motion in part as to Lyman's claims for unjust enrichment (Count IV), quantum meruit (Count V), and negligent infliction of emotional distress (Count VI).

[¶ 11]  A three-day bench trial was held in May 2008.  Prior to trial, Huber withdrew his counterclaims.  After Lyman rested, Huber moved for a judgment as a matter of law on the claims for trespass, intentional infliction of emotional distress, and punitive damages.  The court reserved judgment on the trespass claim, denied the motion as to the intentional infliction of emotional distress claim, and granted the motion as to the punitive damages claim.

[¶ 12]  The court's judgment equitably partitioned the property and found for Huber on Lyman's claims for waste and trespass.  The court, however, entered judgment in favor of Lyman in the amount of $31,000 for ouster, treating the claim as being part of Lyman's separate intentional infliction of emotional distress claim.  The court acknowledged that ouster was not recognized as an independent tort in Maine, but it concluded that Huber's intentional conduct caused Lyman emotional distress and led to her loss of business opportunity and earning capacity:

> The court agrees with the defendant that ouster is not recognized as an independent tort in Maine; however, the court has found that the plaintiff was driven from the property and forced to give up her horse business and that she never had the opportunity to build it into an on-going enterprise.  The defendant's egregious conduct was the sole cause of her leaving;  thus, the root[s] of this claim are the same intentional actions that caused her emotional distress, the result is similar to a loss of business opportunity or earning capacity.

[¶ 13]  The court also awarded Lyman $75,000 in damages on her claim for the intentional infliction of emotional distress.  The court did not explicitly find that Huber's conduct was intentional, but it did find that "Huber's behavior toward Lyman constituted a pattern of cruelty and intimidation over a prolonged period so that the court can only conclude that it is extreme and outrageous."  Although no particular incident may have been extreme and outrageous, the court concluded that Huber's "cumulative conduct" met that standard.  The court found that it could not identify a specific date for the onset of Lyman's severe emotional distress, but that the severe emotional distress developed "over a period of more than several years."

[¶ 14]  Huber moved for reconsideration and to alter or amend the judgment pursuant to M.R. Civ. P. 59(e).  Among other arguments, Huber claimed that Ly-

man was not entitled to a damages award for ouster because such "a theory ... is not a recognized cause of action." The court denied Huber's motion. Neither party moved for additional findings of fact pursuant to M.R. Civ. P. 52. Huber's appeal followed.

## II. DISCUSSION

[¶ 15] Huber's appeal presents two questions: whether the court erred in awarding Lyman damages for (1) the intentional infliction of emotional distress and (2) loss of business opportunity.

### A. Intentional Infliction of Emotional Distress

[¶ 16] A plaintiff must satisfy four elements to recover on a claim of intentional infliction of emotional distress:

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [the defendant's] conduct;

(2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community;

(3) the actions of the defendant caused the plaintiff's emotional distress; and

(4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

1. Although Huber's argument may be construed as challenging the third element of the intentional infliction of emotional distress claim, we find this argument unpersuasive. The court's findings support the conclusion that Huber's conduct caused Lyman emotional distress.

2. We review the court's factual findings for clear error and its legal conclusions de novo.

*Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18, 22–23 (alteration omitted) (quotation marks omitted). Here, Huber assigns error to the court's findings as they relate to the first and fourth elements.[1]

#### 1. Intentional or Reckless Acts

[¶ 17] Huber argues that the court failed to analyze whether his conduct was intentional or reckless and that the evidence was insufficient to establish that Huber intentionally or recklessly caused Lyman's emotional distress. He further argues that his self-directed outbursts and the physical condition of the house do not constitute intentional or reckless conduct and that such conduct was the product of certain "compulsions."

[¶ 18] "[A] person acts intentionally if [the person] subjectively wants or subjectively foresees that harm to another will almost certainly result from [the person's] actions." *Id.* ¶ 12, 784 A.2d at 23 (quotation marks omitted). "A person acts recklessly if [the person] knows or should know that [the person's] conduct creates an unreasonable risk of harm to another person and the unreasonableness of [the person's] actions exceeds negligence." *Id.* ¶ 13, 784 A.2d at 23.

[¶ 19] Here, because neither party filed a motion for additional findings of fact pursuant to M.R. Civ. P. 52, we infer that the trial court found that Huber's conduct was intentional or reckless.[2] The record contains evidence of Huber's tirades, hurtful comments, and efforts to

*Windham Land Trust v. Jeffords*, 2009 ME 29, ¶ 42, 967 A.2d 690, 702. In the absence of a motion for additional findings of fact, we will infer that the court found all the facts necessary to support its decision, and we will inquire whether such inferred findings are supported by the record. *Weeks v. Krysa*, 2008 ME 120, ¶ 11, 955 A.2d 234, 237.

control Lyman's activities and to limit her contact with others, all of which may be consistent with intentional conduct. Thus, this evidence supports the trial court's inferred finding that Huber's conduct was intentional or reckless.

### 2. Emotional Distress That No Reasonable Person Could Endure

[¶ 20] Huber argues that the court erred in finding severe emotional distress because the court's findings did not meet the "high threshold of establishing that the emotional distress suffered was so severe that no reasonable person could be expected to endure it." Huber further argues that Lyman experienced emotional upset more akin to common stress and anxiety caused by everyday events. The breakdown of romantic relationships, he contends, "is an area of emotional injury which does not and should not involve lawsuits and courts."

[¶ 21] The fourth element of the tort of intentional infliction of emotional distress imposes an objective standard of proof. A plaintiff must do more than prove that the emotional distress he or she suffered was serious. Emotional distress that is "severe" is that which is "extremely intense." *See* American Heritage Dictionary 1123 (2nd ed.1982). How intense? So intense that "no reasonable person could be expected to endure it." *See Curtis,* 2001 ME 158, ¶ 10, 784 A.2d at 23 (alteration omitted) (quotation marks omitted). While this is a somewhat amorphous standard, additional insight into its intended meaning is provided by the Restatement (Second) of Torts. As comment k to section 46 of the Restatement (Second) of Torts recognizes, establishing that a plaintiff's emotional suffering qualifies as "severe" normally requires proof of manifestations of the emotional harm such as "shock, illness or other bodily harm" unless the defendant's conduct is found to have been so extreme and outrageous that proof of bodily harm is not needed:

> k. *Bodily harm.* Normally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, which in itself affords evidence that the distress is genuine and severe. The rule stated is not, however, limited to cases where there has been bodily harm; and if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone, without such harm. In such cases the courts may perhaps tend to look for more in the way of outrage as a guarantee that the claim is genuine; but if the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required.[3]

---

**3.** The two illustrations that accompany comment k both emphasize that proof of physical manifestations of the plaintiff's emotional distress, in instances where the plaintiff did not suffer direct physical harm as a result of the defendant's conduct, should not be required where the intentional act that gave rise to the emotional harm was unquestionably outrageous:

Illustrations:

19. A, a police officer, arrests B on a criminal charge. In order to extort a confession, A falsely tells B that her child has been injured in an accident and is dying in a hospital, and that she cannot be released to go to the hospital until she confesses. B suffers severe emotional distress but no physical consequences. A is subject to liability to B.

20. A organizes a mob, and brings it to B's door at night. A tells B that unless he leaves town within ten days the mob will return and lynch him. B suffers severe emotional distress, but no physical consequences. A is subject to liability to B.

Restatement (Second) Torts § 46 cmt. k, illus. 19, 20 (1965). *See also Reagan v. Rider,* 70 Md.App. 503, 521 A.2d 1246, 1251 (1987) (stating that "the very nature of the outrageous conduct—sexual molestation of a child

Restatement (Second) of Torts § 46 cmt. k (1965) (footnote added).

[¶ 22] Our decisions have employed the term "objective symptomatology" in place of "bodily harm," but follow the Restatement (Second) of Torts's approach by recognizing that the fourth element may be satisfied without proof of objective symptomatology if the defendant's conduct was so extreme and outrageous that it can be inferred that no reasonable person could endure the emotional response the conduct would naturally generate. Thus, in *Vicnire v. Ford Motor Credit Co.*, we observed:

> Although "severe" emotional distress is usually manifested by "shock, illness or other bodily harm," such objective symptomatology is not an absolute prerequisite for recovery of damages for intentional, as opposed to negligent, infliction of emotional distress. Restatement (Second) of Torts § 46, Comment k. In appropriate cases, "severe" emotional distress may be inferred from the "extreme and outrageous" nature of the defendant's conduct alone. *Id.*

401 A.2d 148, 154 (Me.1979). We applied the same principle in *Latremore v. Latremore*, 584 A.2d 626, 632–33 (Me.1990), concluding that under the unique circumstances of that case, a wife's severe emotional suffering was established by her husband's testimony regarding the deterioration of her health and that additional corroboration by an expert medical witness was not required.

[¶ 23] Accordingly, when, as here, the existence of the fourth element cannot be inferred from the extreme and outrageous nature of the defendant's conduct alone, a plaintiff must prove that that her emotional distress was so severe as to have manifested objective symptoms demonstrating shock, illness, or other bodily harm. We do not preclude the possibility that this can be achieved without the corroborating testimony of an expert medical or psychological witness. That possibility is, however, remote. In most instances, proof of objective symptoms will require expert testimony to establish that the plaintiff's emotional injury qualifies for a diagnosis such as shock, post-traumatic stress disorder, or some other recognized medical or psychological disease or disorder. *See, e.g., Feltmeier v. Feltmeier*, 207 Ill.2d 263, 278 Ill.Dec. 228, 798 N.E.2d 75, 84 (2003) (holding that a wife's alleged severe mental distress, described as a loss of self-esteem, difficulty forming relationships, post-traumatic stress disorder, and depression, was sufficient to state a claim for intentional infliction of emotional distress against her former husband). This standard prevents recovery for emotional injuries that are anything less than severe. *See Schelling v. Lindell*, 2008 ME 59, ¶¶ 25–26, 942 A.2d 1226, 1233; Restatement (Second) of Torts § 46 cmt. j. Moreover, the standard recognizes that in the context of domestic relationships, recovery may be available in cases involving cumulative acts over an extended period that are in the nature of "coercive, controlling behavior that invades important individual rights of the abused party," Martha Chamallas & Jennifer B. Wriggins, *The Measure of Injury* 75 (2010), but only if the resulting emotional harm to the plaintiff is so severe that no reasonable person could be expected to endure it and the harm is manifested in symptoms that would support a recognized diagnosis.

[¶ 24] Here, the court's factual findings, and all reasonable inferences that may be drawn from the record to support

by a person in a position of authority and trust during six of her more critical formative

years" could permit a jury to find that the plaintiff suffered severe emotional distress).

those findings, do not demonstrate that Lyman suffered emotional distress so severe that no reasonable person could be expected to endure it. Lyman described feeling inadequate and withdrawn, socially paralyzed, and fearful and intimidated by Huber's controlling and compulsive behavior. Her friends described her as being, at times, "guarded, jumpy, and withdrawn," "shaken," and "tense, afraid and on edge." Although these findings describe intermittent symptoms associated with emotional distress, Lyman endured the distress over the course of her fifteen-year relationship with Huber as evidenced by the fact that she successfully managed her business, she met the demands of daily living, she never requested assistance from the police or other public officials, and she did not seek treatment from a medical or mental health professional. Even if we assume that Lyman's condition qualified for a recognized medical or psychological diagnosis, we cannot conclude that her emotional distress was so severe that no reasonable person could be expected to endure it.

[¶ 25] We are mindful that the form of emotional distress experienced by Lyman is serious, and that the law rightfully sanctions those who seek to control their domestic partner through emotionally abusive and coercive behaviors. There are various remedies for the victims of such conduct, including a statutory action for protection from abuse. See 19-A M.R.S. §§ 4001–4014 (2009). As we recognize today, a civil action for intentional infliction of emotional distress may also be available to some victims. But our application and development of this civil action in the context of domestic relationships must also account for the sad reality that dysfunctional domestic relationships are not uncommon in modern society. If the elements of proof governing actions for intentional infliction of emotional distress are left vague or set too low, we risk elevating all dysfunctional domestic relationships into potential damages actions.

[¶ 26] Without in any way minimizing the seriousness of the emotional harm suffered by Lyman as a result of her relationship with Huber, we must conclude that the court erred as a matter of law when it determined that her emotional suffering was so severe that no reasonable person could be expected to endure it.

B. Damages for Loss of Business Opportunity

[¶ 27] Huber also contends that the Superior Court erred in awarding Lyman money damages for her loss of business opportunity based on her claim of ouster because ouster is not recognized as an actionable tort in Maine. He further asserts that even if we recognize such a tort, the trial court erred because there was no evidence that Lyman was ousted from the Cape Elizabeth property; rather, she left the property voluntarily.

[¶ 28] Ouster has not previously been recognized as an actionable tort in Maine. See Porter v. Hooper, 13 Me. 25, 29 (1836) (stating that a tenant-in-common may occupy property to the exclusion of a co-tenant without committing a trespass); Davis v. Poland, 102 Me. 192, 195, 66 A. 380, 382 (1906) (stating that a tenant-in-common's destruction of common property or practical destruction of a co-tenant's property interest constitutes a trespass); see generally Simmons, Zillman & Gregory, Maine Tort Law (2004 ed. & Supp. 2009) (not addressing the tort of ouster, but discussing, at § 5.05, that a co-tenant's exclusion of another co-tenant is not a trespass). The Superior Court recognized this and, instead of awarding Lyman damages on her ouster claim, it included those damages, measured by her loss of business opportunity, in her damages for intentional

infliction of emotional distress. Because we have already concluded that Lyman was not entitled to relief for her claim of intentional infliction of emotional distress, the court's award of damages to Lyman for her loss of business opportunity must also be vacated.

The entry is:

Judgment vacated. The case is remanded to the Superior Court for the entry of judgment consistent with this opinion.