MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2024 ME 72
Docket:        BCD-23-98
Argued:        December 5, 2023
Decided:       September 17, 2024

Panel:         STANFILL, C.J., and MEAD, HORTON, LAWRENCE, and DOUGLAS, JJ.*

BRETT DEANE et al.

v.

CENTRAL MAINE POWER COMPANY

DOUGLAS, J.

[¶1] From 2018 to 2020, Central Maine Power Company (CMP) sent misleading communications to thousands of customers who were behind in their electric bill payments, threatening to disconnect their electric service during the winter. These communications did not provide full, accurate information about the customers' rights and the process that CMP is required to follow under the Maine Public Utilities Commission's rules. In 2020, the Commission conducted a formal investigation of CMP's use of the misleading disconnection communications, which resulted in CMP consenting to a finding that it had violated the rules and to paying the maximum administrative penalty of $500,000.

---

* Although Justice Jabar participated in this appeal, he retired before this opinion was certified.

2

[¶2] Brett Deane, Henry Lavender, and Joleen Mitchell (Plaintiffs) are three CMP customers who received the misleading communications from CMP. In January 2020, the same month that the Commission began its investigation, Plaintiffs filed a multicount complaint against CMP to recover damages for injuries they allegedly suffered as a result of "systematic and repeated deception and misrepresentation by CMP in the form of 'disconnection notices.'"[1] The Business and Consumer Docket (*Murphy, J.*) dismissed Plaintiffs' claims that alleged fraudulent misrepresentation, negligent misrepresentation, and statutory violations, and granted summary judgment (*McKeon, J.*) in favor of CMP on Plaintiffs' claim of intentional infliction of emotional distress (IIED). Plaintiffs now appeal, and we affirm the judgments.

## I. BACKGROUND

### A. Factual Allegations as to Dismissed Counts

[¶3] As to the counts that the court dismissed, we set forth the following facts, drawn from the allegations in Plaintiffs' corrected second amended complaint. *See Packgen, Inc. v. Bernstein, Shur, Sawyer & Nelson, P.A.*, 2019 ME 90, ¶¶ 3, 16, 209 A.3d 116. ("When reviewing the grant of a motion to dismiss, we examine the complaint in the light most favorable to the plaintiff to

---

[1] Although other individuals were also named as plaintiffs at various stages of the litigation, they have been dismissed for various reasons and are no longer parties to the case.

determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." (quotation marks omitted)).  As to the IIED count on which the court granted summary judgment, we separately set forth below, *see supra* ¶¶ 39-58, facts drawn from the parties' supported statements of material facts in the summary judgment record.  *See Handlin v. Broadreach Pub. Rels., LLC*, 2022 ME 2, ¶ 2, 265 A.3d 1008.

[¶4]  CMP is a public utility that transmits and delivers electricity to more than 624,000 customers in Maine.  CMP bills its customers for the transmission and distribution of power and retains the right, under the Commission's rules, to disconnect its service to customers who fail to pay their bills.  There are specific rules concerning disconnection practices during the winter.[2]

[¶5]  From 2018 to 2020, CMP sent communications to certain customers, including Plaintiffs, threatening disconnection of service during the winter.  The communications deliberately failed to inform those customers, in violation of the rules, that the threatened disconnection could take place only with the consent of the Commission's Consumer Assistance and Safety Division (CASD).  The omission of that information was designed to give customers the

---

[2]  The rules in effect during the relevant period, 65-407 C.M.R. ch. 815 (effective July 31, 2013), have since been amended, 65-407 C.M.R. ch. 815 (effective Jan. 9, 2022).

4

false impression that their electric service could be disconnected at CMP's sole discretion. CMP's intent in sending the misleading communications regarding winter disconnection was to pressure customers into believing that to avoid disconnection they must pay their account balances in full or enter payment arrangements with CMP.

[¶6] These deceptive and misleading communications caused Plaintiffs and other CMP customers to face "burdensome payment decisions" that they would not have faced had they been accurately informed about the requirement that CMP first obtain CASD consent to a proposed disconnection. CMP customers who had questions or reasons for deferring part or all the charges billed did not have an opportunity to raise those questions or present those reasons before the CASD. And many CMP customers, including Plaintiffs, who received the misleading communications experienced mental pain, anguish, and fear of disconnection of their electric service by CMP.[3]

[¶7] Deane, Lavender, and Mitchell are among these CMP customers. Between 2019 and 2020, each received notices from CMP threatening to disconnect their service if payments were not made on their overdue bills.

---

[3] Plaintiffs have never claimed that CMP disconnected their power during the winter, only that CMP sent communications threatening to disconnect their power. The record shows that since the 2016-2017 winter CMP has not disconnected service during the winter to any of its customers.

Receiving these notices under the perceived threat of losing their power in the winter caused them, they have alleged, "financial and/or emotional harm."

[¶8]  Since January 2018, Deane has received electric service from CMP. At one point, he fell behind in payments.  He entered a payment plan but was unable to make payments under the plan.  Deane's electric service was disconnected in September or October 2019 and then restored upon payment of a full month's bill.  He fell behind once again in December 2019.

[¶9]  On or about January 14, 2020, CMP sent a letter to Deane stating that "[w]hen we are not able to contact you, we can disconnect your electric service during the winter months without the approval of the Maine Public Utilities Commission's . . . Customer Assistance and Safety Division."  One week later, Deane received a disconnection notice from CMP.  Nowhere on this notice or on any previous collection notice that Deane had received from CMP was it stated that CMP required the permission of the CASD to disconnect Deane's service; that CMP was required to notify Deane of any request to the CASD for permission; that the CASD had the authority to prevent disconnection based on factors identified in the rules; or that, if Deane did not respond within five business days of receiving the Notice of Customer Rights, CMP could either seek

6

permission from the CASD to disconnect his service or "cycle disconnect"[4] his service.

[¶10] Deane believed that, unless he paid the amount demanded by CMP, CMP would disconnect his service on the date stated in the notice and that he had no recourse to prevent or delay disconnection other than by making the payment. On January 25, 2020, Deane learned that CMP could not disconnect his service during the winter without approval from the CASD. During the approximately eleven days from when Deane received the letter from CMP to when he learned that the statements in the disconnection notice were false, Deane and his family worried night and day about what would happen if their electricity were disconnected, which resulted in "sleepless nights and extreme mental distress."

[¶11] Since approximately 2016 or 2017, Lavender has received electric service from CMP for his residence and, separately, for his garage. In 2018, he fell behind in payments. In November 2018, CMP sent a letter to Lavender stating that "[w]hen we are not able to contact you, we can disconnect your

---

[4] "Cycle disconnection" is the process of disconnecting electric service during the winter only during daylight hours on weekdays and only when certain other conditions are not present. *See* 65-407 C.M.R. ch. 815, § 10(M)(3) (effective July 31, 2013).

electric service during the winter months without the approval of the Maine Public Utilities Commission's . . . Customer Assistance and Safety Division."

[¶12]  In January 2020, Lavender received a disconnection notice from CMP.  The collection notice did not inform Lavender that CMP was required to obtain permission from the CASD to disconnect Lavender's service, that CMP was required to notify Lavender of any request to the CASD for permission, or that the CASD had the authority to prevent disconnection.  As a result, Lavender believed that, unless he paid the amount demanded by CMP, his service would be disconnected, and he would have no recourse to prevent or delay the disconnection other than by making the payment.  In the same month that he received the disconnection notice, Lavender learned that the statements in the notice were false.

[¶13]  Before learning that the statements in the notice were false, Lavender and his family "worried night and day" about the threatened disconnection.  Lavender feared for his children, who rely on electrically powered nebulizers to deliver their asthma medication, and for his farm animals, which provide both food and income for his family.  Lavender and his wife "lost sleep" and "suffered anxiety and extreme mental distress."

8

[¶14]  Mitchell has received electric service from CMP since 2013.  In 2017, she began receiving high bills from CMP and raised questions about the charges.  In March 2018, a person who identified himself as a CMP employee arrived at her home, demanded that payment be made on the spot, and when she did not make payment, gave her a notice stating, "If you fail to contact us, we can disconnect your electric service during the winter months without the approval of the Maine Public Utilities Commission."  CMP stopped sending Mitchell bills but has threatened disconnection at various times of year, including during the winters of 2017, 2018, 2019, and 2020.

[¶15]  None of the notices that Mitchell received stated that CMP needed the CASD's permission to disconnect Mitchell's service; that CMP was required to notify Mitchell of any request for permission; that the CASD has the authority to prevent disconnection; or that, if she did not respond within five business days of receiving the Notice of Customer Rights, CMP could seek permission from the CASD to either disconnect or "cycle disconnect" her service.

[¶16]  Mitchell believed that unless she paid the amount demanded by CMP, CMP would disconnect her service and she would have no recourse to prevent or delay the disconnection other than by making the payment.  From the time that Mitchell received the first disconnection notice until sometime in

late 2018, when she learned that CMP could not disconnect her service during the winter without CASD approval, Mitchell experienced what she describes as "severe mental distress" and "worried night and day" about what would happen if her electric service were disconnected.

## B. Procedural History

[¶17] In January 2020, Plaintiffs filed a complaint against CMP in the Superior Court (Cumberland County), and the matter was transferred to the Business and Consumer Docket. Over the next several months, the complaint was amended twice, and the second amended complaint was later corrected. In their corrected second amended complaint, Plaintiffs asserted claims for fraudulent misrepresentation (Counts 1 & 2), negligent misrepresentation (Count 3), "liability under 35-A M.R.S. § 1501" (Count 4), violation of the Maine Unfair Trade Practices Act (Count 5), IIED (Count 6), and punitive damages (Count 7). They also moved the court to certify the matter as a class action pursuant to M.R. Civ. P. 23, which request was eventually denied.

[¶18] In August 2020, CMP filed a motion to dismiss Plaintiffs' corrected second amended complaint for failure to state a claim upon which relief can be granted. After a hearing, the court (*Murphy, J.*) granted CMP's motion in part, dismissing Counts 1-5. The court concluded that dismissal of Counts 1-5 was

required because Plaintiffs failed to allege that they suffered any pecuniary harm and that dismissal of Count 4 was further warranted because 35-A M.R.S. § 1501 (2024) does not provide a private right of action. The court denied the motion with respect to Plaintiffs' claim for IIED, concluding that the complaint alleged sufficient facts, though it was a "close call."

[¶19] In November 2022, CMP filed a motion for summary judgment on Plaintiffs' IIED claim, arguing that Plaintiffs offered insufficient evidence to establish two of the four elements of IIED—namely, extreme and outrageous conduct and severe emotional distress. After a hearing, the court (*McKeon, J.*) entered a judgment in favor of CMP. The court found that, although Plaintiffs had generated a genuine issue of material fact as to whether CMP's conduct was sufficiently "extreme and outrageous," they failed to establish that their emotional distress was sufficiently "severe."

[¶20] Plaintiffs filed a timely appeal.

## II. DISCUSSION

### A. Dismissal of Misrepresentation Claims

[¶21] Plaintiffs contend that, contrary to the holding of the trial court, their corrected second amended complaint adequately stated claims for fraudulent misrepresentation and negligent misrepresentation. They maintain

that they sufficiently pleaded pecuniary harm, or, in the alternative, that their allegations of emotional harm are actionable.

[¶22] "A court properly dismisses a complaint when the complaint fails 'to state a claim upon which relief can be granted.'" *Paul v. Town of Liberty*, 2016 ME 173, ¶ 19, 151 A.3d 924 (quoting M.R. Civ. P. 12(b)(6)). We review de novo the legal sufficiency of a complaint by examining the complaint in the light most favorable to the plaintiff. *Ramsey v. Baxter Title Co.*, 2012 ME 113, ¶ 6, 54 A.3d 710. "The complaint must describe the essence of the claim and allege facts sufficient to demonstrate that the complaining party has been injured in a way that entitles him or her to relief." *Meridian Med. Sys., LLC v. Epix Therapeutics, Inc.*, 2021 ME 24, ¶ 3, 250 A.3d 122 (quotation marks omitted). "[M]erely reciting the elements of a claim is not enough." *America v. Sunspray Condo. Ass'n*, 2013 ME 19, ¶ 13, 61 A.3d 1249. Moreover, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." M.R. Civ. P. 9(b). To survive a motion to dismiss, a complaint asserting a claim of fraud must meet this heightened pleading requirement. *Bean v. Cummings*, 2008 ME 18, ¶ 8, 939 A.2d 676; *Picher v. Roman Cath. Bishop of Portland*, 2013 ME 99, ¶ 2, 82 A.3d 101.

12

[¶23]  For their claims of fraudulent misrepresentation, Plaintiffs had to aver in their complaint that (1) CMP made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it was true or false (4) for the purpose of inducing Plaintiffs to act in reliance upon it, and (5) Plaintiffs justifiably relied upon the representation as true and acted upon it to their damage.  *See Flaherty v. Muther*, 2011 ME 32, ¶ 45, 17 A.3d 640.  They also had to allege pecuniary damages.  *Jourdain v. Dineen*, 527 A.2d 1304, 1307 & n.2 (Me. 1987) (holding that it is well-established in Maine that pecuniary loss is the proper measure of damages in a fraud action and that damages for emotional harm are not recoverable for fraud).

[¶24]  For their claim of negligent misrepresentation, Plaintiffs had to plead sufficient facts to establish that (1) CMP, in the course of its business or in any transaction in which it had a pecuniary interest, supplied false information for the guidance of Plaintiffs in their business transactions; (2) CMP failed to exercise reasonable care or competence in communicating the information; and (3) Plaintiffs suffered a pecuniary loss by justifiably relying upon the information.  *See Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 13, 832 A.2d 771; *Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990).

[¶25]   In Maine, only pecuniary losses are recoverable for claims of fraudulent misrepresentation and negligent misrepresentation. *See Noveletsky v. Metro. Life Ins. Co.*, 49 F. Supp. 3d 123, 152 (D. Me. 2014) ("In a fraudulent misrepresentation case, the measure of damages is the benefit of the bargain the plaintiff had expected.  In a negligent misrepresentation case, damages are limited to the plaintiff's out-of-pocket losses." (citations omitted)).

[¶26]  Contrary to Plaintiffs' contention, their corrected second amended complaint does not sufficiently plead pecuniary harm.   Plaintiffs point to allegations in their complaint that they "fe[lt] extreme pressure to make payments to CMP" and that they were "deceived into believing that unless [they] paid the amount demanded by CMP in the notice[s], CMP would in fact disconnect [their] service."  Plaintiffs do not allege that they actually made any payments to CMP, however.[5]  And even if they had made payments to CMP upon receiving the misleading notices, we have never held that the payment of a debt

---

[5] Although Deane, Lavender, and Mitchell did not allege that they made any payments to CMP, their corrected second amended complaint included two other named plaintiffs, Pauline Nelson and Susan Solano, whose alleged circumstances differed slightly from those of Deane, Lavender, and Mitchell.  Nelson and Solano alleged that—like Deane, Lavender, and Mitchell—they received CMP's deceptive disconnection notices but that—unlike Deane, Lavender, and Mitchell—Nelson entered into a payment arrangement with CMP and Solano paid CMP the arrearage amount listed on the notice. After the court entered its order on the motion to dismiss, Solano and Nelson were voluntarily dismissed from the action.  Because Solano's and Nelson's claims are now moot, we do not consider the allegations in the complaint that pertain only to them.

14

actually incurred and validly owed constitutes a pecuniary loss.[6] *See Moritz v. Daniel N. Gordon, P.C.*, 895 F. Supp. 2d 1097, 1117 (W.D. Wash. 2012) (surveying "courts [that] have found that plaintiffs are not injured in the amount collected when the plaintiff owed the debt even where the debt collector violated state law in doing so").

[¶27]  We conclude that, even when applying ordinary pleading standards, the allegations in the complaint do not establish that Plaintiffs suffered the requisite pecuniary harm, and therefore, the trial court did not err by dismissing Plaintiffs' claims for fraudulent misrepresentation and negligent misrepresentation.

## B.     Dismissal of Statutory Cause of Action

[¶28]  Plaintiffs next argue that the Legislature created a private right of action in 35-A M.R.S. § 1501 for any injury caused by a public utility's violation

---

[6] Plaintiffs additionally point to other allegations in the corrected second amended complaint, but we are unpersuaded that those allegations sufficiently allege pecuniary harm.  For example, the complaint broadly alleges that, because of CMP's misleading notices, "CMP customers" had to make "burdensome payment decisions," that they have not had an opportunity to appear in front of the CASD to ask questions and raise defenses, and "their funds were misdirected."  Even if we assume that these allegations apply to Plaintiffs themselves and not just to the putative class members no longer a part of the case, they do not allege pecuniary injury.  Rather, these allegations are more in the nature of emotional distress or frustration due to the pressure of having to make difficult decisions about paying their bills or being deprived of a process to question the payment demands being made.  We have never recognized emotional distress damages in fraudulent misrepresentation or negligent misrepresentation claims and decline to do so now.  *See Neurosurgery & Spine Surgery, S.C. v. Goldman*, 790 N.E.2d 925, 932-33 (Ill. App. Ct. 2003) (exploring the historical context for limiting damages to pecuniary losses in fraudulent misrepresentation claims).

of Title 35-A and that the trial court therefore erred by dismissing Count 4 of their corrected second amended complaint.

[¶29]  To determine whether section 1501 establishes a private right of action, "we interpret the statute de novo to effectuate the legislative intent," starting with the statute's plain language.  *Wawenock, LLC v. Dep't of Transp.*, 2018 ME 83, ¶ 7, 187 A.3d 609.  As we have noted previously, "when the Legislature deems it 'essential that a private party have a right of action, it has expressly created one.'"  *Charlton v. Town of Oxford*, 2001 ME 104, ¶ 15, 774 A.2d 366 (quoting *Larrabee v. Penobscot Frozen Foods, Inc.*, 486 A.2d 97, 101 (Me. 1984)).

[¶30]  For example, we have recognized an express private right of action in connection with other statutes when the statutory language is explicit. *See, e.g.*, *Bartner v. Carter*, 405 A.2d 194, 199 (Me. 1979) (Maine Unfair Trade Practices Act); *Bank of Am., N.A. v. Camire*, 2017 ME 20, ¶ 13, 155 A.3d 416 (Maine Fair Debt Collection Practices Act); *McKinnon v. Honeywell Int'l, Inc.*, 2009 ME 69, ¶¶ 17, 19, 21, 977 A.2d 420 (Maine's antitrust statute); *Campbell v. Harmon*, 96 Me. 87, 88-89, 51 A. 801, 802 (1901) (civil damage act).

[¶31]  The statutes at issue in each of these cases not only identify the prohibited conduct, they expressly vest a private party with the right to seek

16

redress—that is, they state that the person injured has "a right of action in his own name," R.S. ch. 27 § 49 (1883); may "bring an action," 5 M.R.S. § 213(1) (2024); may "sue for the injury in a civil action," 10 M.R.S. § 1104(1) (2024); or may seek damages "[i]n the case of any action by an individual" or in "a class action," 32 M.R.S. § 11054(1)-(1-A) (2024). These statutes also establish, to varying degrees, the contours of the rights of action, such as the type and amount of damages recoverable, the availability of other forms of relief, and matters related to evidence and procedure.[7]

[¶32] By contrast, 35-A M.R.S. § 1501 provides in full:

If a public utility violates this Title, causes or permits a violation of this Title or omits to do anything that this Title requires it to do it may be liable in damages to the person injured as a result. Recovery under this section does not affect a recovery by the State of the penalty prescribed for the violation.

[¶33] Although section 1501 identifies prohibited conduct—i.e., a violation of Title 35-A by a utility—and uses words such as "liable" and "damages," it does not expressly state that a person who has been injured under such circumstances has a "right of action" against or "may sue" the utility under

---

[7] *See, e.g.*, 5 M.R.S. § 213 (2024) (specifying in which court the action may be brought and prescribing the nature of the relief available); 10 M.R.S. § 1104 (2024) (establishing the scope of the relief available); 32 M.R.S. § 11054 (2024) (setting the scope of the damages available, factors for determining the amount of liability, defenses, and a limitations period); R.S. ch. 27 § 49 (1883) (prescribing the types of damages available, joint-and-several liability, and an evidentiary standard for establishing one of the elements).

the statute itself.  Furthermore, there is no guidance as to what the appropriate contours of the purported right of action would be, such as where the action would be brought, the standard to which the utility would be held, or the nature and extent of damages available.[8]  We therefore conclude that section 1501 does not expressly confer a private right of action.

[¶34]  Although "[w]e are hesitant to imply a private right of action where the legislature has not expressly stated that a cause of action exists," in the absence of express statutory language we look to "legislative intent, expressed either in the statute or the legislative history" to ascertain whether the statute implies a private right of action.  *Charlton*, 2001 ME 104, ¶ 15, 774 A.2d 366. Because the language of section 1501 alone is insufficient to confer a private right of action, we look to other indicia of legislative intent, such as the location and operation of the statute in the overall statutory scheme, and its legislative history.  *Id.* ¶ 16.

---

[8]  Again, in contrast to 35-A M.R.S. § 1501 (2024) are two statutes the Legislature has enacted that expressly confer a private right of action to seek redress for injuries arising out of a utility's violation of rules regarding termination of service.  The first creates a cause of action in the District Court for property loss from a termination of service "suffered by a customer causally related to a willful or reckless violation by a public utility of any substantive rule adopted by the commission pursuant to the authority granted in this section."  35-A M.R.S. § 704(4) (2024).  The second, enacted after the events at issue in this case, provides: "A transmission and distribution utility that violates this section [regarding winter disconnection notices] is subject to a civil penalty not to exceed $2,500, payable to the customer to whom the prohibited communication is sent.  The penalty is recoverable in a civil action and is in addition to any other remedies to which the customer may be entitled."  35-A M.R.S. § 718(4) (2024); *see* P.L. 2021, ch. 347, § 1 (effective Oct. 18, 2021).

18

[¶35]  Section 1501 is placed in chapter 15 of Title 35-A.  Chapter 15 is titled "Sanctions and Administrative Penalties" and establishes broad authority in the Commission to impose penalties and other sanctions on utilities for a wide array of conduct.  In this context, section 1501's language—which, as noted, does not explicitly authorize individuals to bring private actions but rather establishes a general standard of liability—operates in the nature of a savings clause which makes clear that remedies via independent, common law causes of action are not supplanted by the Commission's pervasive regulatory authority to hold utilities accountable through the imposition of sanctions and penalties.  Thus, the more reasonable interpretation of that provision is that a utility's violation of a duty imposed by Title 35-A may support claims for damages under common law causes of action.  *See Stearns v. Atl. & St. Lawrence R. Co.*, 46 Me. 95, 114-15, 117 (1858) (providing that when a statute "forbids the doing of an injury to another" but provides no remedy "still the party shall have an action" under the common law); *see also Smith v. Cent. Me. Power Co.*, 2010 ME 9, ¶ 10 & n.3, 988 A.2d 968 (stating that a violation of a safety statute or regulation may be evidence of negligence but does not constitute negligence per se); *Binette v. Dyer Libr. Ass'n*, 688 A.2d 898, 903 (Me. 1996) (holding that a

fact finder may consider the failure to disclose certain information in violation of a safety statute as evidence of negligent misrepresentation).

[¶36]    Further, there is simply nothing in the legislative history suggesting an intent to create a private right of action.  Section 1501 can be traced to section 62 of the enabling legislation establishing the Public Utilities Commission over one hundred years ago.[9]  *See* P.L. 1913, ch. 129 (effective July 1, 1913); *see also Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶ 32, 237 A.3d 882.  The legislation's principal aim was the establishment of an independent governmental entity—the Commission—to regulate utilities through statutorily created oversight and enforcement mechanisms.  *See* Legis. Rec. 883-85, 1033-35, 1037 (1913); *In re Searsport Water Co.*, 118 Me. 382, 396, 108 A. 452, 459 (1919) (describing the Commission as "a body specially clothed with all the authority of the state for the performance of an important governmental function").

---

[9]  The original provision read:

> If any public utility shall do or cause to be done or permit to be done any matter, act or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter or thing required to be done by it, such public utility shall be liable in damages to the person, association or corporation injured thereby; provided that any recovery as in this section provided, shall in no manner affect a recovery by the state of the penalty prescribed for such violation.

P.L. 1913, ch. 129, § 62 (effective July 1, 1913).

[¶37]   From the outset, the Commission was vested with enforcement powers to hold utilities accountable through sanctions and administrative penalties, essentially similar to those now found in chapter 15 of Title 35-A. The inclusion of section 62—now section 1501—supplements that authority. Including an additional measure of accountability via the potential for civil liability outside of the statutory regime's provision for administrative sanctions and penalties does not, without more, evidence an intent to create a private right of action.  Moreover, concluding that section 1501 creates a private right of action would effectively subject a utility to a standard of strict liability as well as eliminate other defenses and limits on recoverable damages applicable in common law actions.  It is doubtful that the Legislature, either today or in 1913 when section 1501's predecessor was enacted, would intend this result.[10]

[¶38]   In the absence of express statutory language or clear legislative intent, we decline to construe section 1501 as providing either an express or implied private right of action for a violation of Title 35-A.  *See Larrabee*,

---

[10]  Even if we had concluded that section 1501 establishes a private right of action, dismissal of Plaintiffs' corrected second amended complaint would still be required because they did not allege pecuniary damages.  Plaintiffs contend that section 1501 permits recovery for *any injury* caused by *any violation* of the laws and regulations governing public utilities.  Such a contention is untenable. It is inconceivable that the Legislature, in 1913, would have intended that public utilities be held strictly liable for purely emotional distress damages.  *See Schelling v. Lindell*, 2008 ME 59, ¶ 22, 942 A.2d 1226 (observing that the "modernization of emotional damage compensability in Maine" began in 1970).

486 A.2d at 101 (noting that "if our Legislature had intended that a private party have a right of action under [the statute], it would have expressed its intent in the statutory language or legislative history or, more likely, expressly enacted one").

## C.    Summary Judgment on IIED Claim

[¶39]  Plaintiffs contend that the trial court erred by granting summary judgment in favor of CMP on their IIED claim.  They maintain that the trial court should have concluded that there was a genuine dispute of material fact because sufficient evidence of severe emotional distress was presented to generate an issue of fact for a jury, or, alternatively, CMP's conduct was so extreme and outrageous that severe emotional distress could be inferred.

[¶40]  "We review motions for summary judgment for errors of law, viewing the evidence in the light most favorable to the nonprevailing party . . . to determine whether the record supports the conclusion that there is no genuine issue of material fact and that the prevailing party is entitled to a judgment as a matter of law." *Curtis v. Porter*, 2001 ME 158, ¶ 6, 784 A.2d 18. "When, as here, a defendant moves for summary judgment, the plaintiff must establish a *prima facie* case for each element of [the] cause of action that is properly challenged in the defendant's motion." *Id.* ¶ 8 (quotation marks

omitted). "We first determine the elements of the causes of action at issue and then review the facts set forth in the parties' statements of material facts that are supported by appropriate record references. Uncontroverted facts are accepted as true for the purpose of testing the propriety of a summary judgment." *Id.* (footnote and citation omitted). Although we will not speculate, we will consider any reasonable inferences that a fact finder could draw from the facts presented. *Id.* ¶ 9.

[¶41] With regard to every motion for summary judgment, the trial court acts as a gatekeeper. *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 16, 711 A.2d 842 ("[W]hile the jury must determine whether the elements of the tort were in fact satisfied, the court must first determine whether, as a matter of law, the facts alleged are sufficient to satisfy the elements."). "[I]n the context of summary judgment on a claim for intentional infliction of emotional distress, it is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 26, 48 A.3d 774 (quotation marks omitted).

[¶42] In carrying out this gatekeeping function, a court maintains a high bar in IIED claims because of the "open-ended nature of this claim and the wide

range of behavior to which it might plausibly apply."[11]  Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 46 cmt. g (Am. L. Inst. 2012).  The court's screening role is important here because of the high threshold imposed by the tort, which encompasses only the most extreme cases, and the frequent employment of this tort as a supplement to other claims.  *Id.* § 46 cmts. a & j.

[¶43]  To withstand a defendant's motion for summary judgment on an IIED claim, a plaintiff must present evidence in support of each of the following four elements:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [the defendant's] conduct;
>
> (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community;
>
> (3) the actions of the defendant caused the plaintiff's emotional distress; and
>
> (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

---

[11] "This greater supervision is comparable to that exercised in other areas of tort law where principle or policy requires limits on tort liability," such as affirmative duties, scope of liability, and duty rules, Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 46 cmt. g (Am. L. Inst. 2012), and has become custom "[b]ecause of the fear of fictitious or trivial claims, distrust of the proof offered, and the difficulty of setting up any satisfactory boundaries to liability," Restatement (Second) of Torts § 46 cmt. b (Am. L. Inst. 1965).

*Curtis*, 2001 ME 158, ¶ 10, 784 A.2d 18 (alteration and quotation marks omitted).

[¶44]  In this appeal, the parties focus on the fourth element—whether the emotional distress alleged by Plaintiffs was so severe that no reasonable person could have been expected to endure it.  "The fourth element of the tort of intentional infliction of emotional distress imposes an objective standard of proof."  *Lyman v. Huber*, 2010 ME 139, ¶ 21, 10 A.3d 707; *see also Gammon v. Osteopathic Hosp. of Me., Inc.*, 534 A.2d 1282, 1285 & n.8 (Me. 1987) (stating that the standard is from the perspective of a normally constituted, ordinarily sensitive person).  The element of severe emotional distress may be satisfied two ways—either by proof of objective symptomatology or by inference based on the extreme and outrageous nature of the defendant's conduct.  *Lyman*, 2010 ME 139, ¶ 21, 10 A.3d 707.

### 1.  Objective Symptomatology

[¶45]   To establish severe emotional distress based on objective symptomatology, "[a] plaintiff must do more than prove that the emotional distress he or she suffered was serious."  *Id.*  Emotional distress that qualifies as "severe" is that which is "extremely intense," such as "shock, illness, or other bodily harm."  *Id.*  "The intensity and the duration of the harm are factors to be

considered in determining its severity." Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 46 cmt. j.

[¶46] "Stress, humiliation, loss of sleep, and anxiety occasioned by the events of everyday life are endurable" and therefore insufficient. *Schelling v. Lindell*, 2008 ME 59, ¶ 26, 942 A.2d 1226; *see also Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 150-51, 155 (Me. 1979) (concluding that feeling "kind of down," "mad," and "nervous for about a month" after a creditor requested payment and later repossessed plaintiff's vehicle was not so severe that no reasonable person could be expected to endure it); *Lougee Conservancy*, 2012 ME 103, ¶¶ 8, 26, 48 A.3d 774 (concluding that feelings of upset and defeat leading to ten months of counseling were not substantial enough to qualify as severe emotional distress); *Argereow v. Weisberg*, 2018 ME 140, ¶¶ 8, 29, 195 A.3d 1210 (stating that plaintiff's allegation that defendant's conduct caused enough stress to require marriage counseling was not enough to support a claim for IIED).

[¶47] "In most instances, proof of objective symptoms will require expert testimony to establish that the plaintiff's emotional injury qualifies for a diagnosis such as shock, post-traumatic stress disorder, or some other recognized medical or psychological disease or disorder." *Lyman*, 2010 ME

26

139, ¶ 23, 10 A.3d 707. "This standard prevents recovery for emotional injuries that are anything less than severe." *Id.*

[¶48] Keeping the court's role as gatekeeper in mind, we conclude that as a matter of law Plaintiffs' symptoms do not satisfy the fourth element. Deane reported feeling "stress" and "anxiety" at the thought that his power could be disconnected during the winter. Deane also reported that he and his family "worried night and day" about the threatened disconnection, resulting in "sleepless nights and extreme mental distress." Moreover, Deane and his wife were "scared shitless" upon receiving one of the notices from CMP. Out of fear that he would be "unable to satisfy CMP," Deane moved his family out of their apartment and into a camper, which he purchased for $4,500 plus the cost of insurance and accessories, including a gravity fed sewage system.[12]

[¶49] Lavender stated that he "suffered from depression and anxiety as a result of the misleading notices." He further stated that his "worry resulted in sleepless nights," and he ceased having sexual relations with his wife. Lavender reported that he was afraid for his children and farm animals. Nevertheless, Lavender was able to carry out his daily living activities, such as going to work and caring for the animals. When he learned that CMP could not

---

[12] Deane owed CMP $3,337.98.

unilaterally turn off his power, he felt that "the whole thing had been a giant mind game."

[¶50] Mitchell similarly "was filled with fear, dread and anxiety." She felt "angry" because she did not know what to do. She reported that she was able to eat only crackers for a few days. Mitchell stated that, after a CMP employee made a premises visit, she was unable to sleep for a few days. Mitchell further reported that her feelings worsened each time she received a notice from CMP and that her heart raced. She resorted to pacing and tried to distract herself by posting on Facebook and listening to music.

[¶51] Although Lavender discussed his anxiety with his therapist, Deane and Mitchell did not seek treatment, and none of the Plaintiffs received a medical diagnosis due to the distress they felt. Plaintiffs offered an affidavit of a clinical psychologist who averred that Plaintiffs had suffered "severe emotional distress" but also stated that they "were not examined by a mental health professional" and that "[i]t is difficult to make a clinical diagnosis based upon questions elicited during a deposition." Furthermore, to the extent that Plaintiffs' claim was based on an exacerbation of preexisting medical conditions, the test is an objective one. Plaintiffs generally did not indicate how long their symptoms of distress persisted, but the record suggests that shortly

after they received the misleading notices, Plaintiffs learned that CMP could not unilaterally shut off their power.

[¶52]  We conclude that the trial court did not err in determining that, as a matter of law, Plaintiffs did not manifest the degree, duration, or type of symptoms that would satisfy the severe emotional distress element required to establish a claim for IIED.

### 2. Inferring Severe Emotional Distress Based on the Severity of the Extreme and Outrageous Conduct

[¶53]  In *Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me. 1979), we adopted the rule of liability stated in the Restatement (Second) of Torts, noting:

> Although "severe" emotional distress is usually manifested by "shock, illness or other bodily harm," such objective symptomatology is not an absolute prerequisite for recovery of damages for intentional, as opposed to negligent, infliction of emotional distress.  Restatement (Second) of Torts § 46, Comment K.  *In appropriate cases, "severe" emotional distress may be inferred from the "extreme and outrageous" nature of the defendant's conduct alone.*

(Emphasis added.)  We decided *Vicnire* on the basis that there was no evidence of objective symptomatology without addressing the alternative test provided in the Restatement.  *Id.* at 155.

[¶54]  In *Lyman v. Huber*, 2010 ME 139, ¶ 21, 10 A.3d 707, we again observed that severe emotional distress "normally requires proof of manifestations of the emotional harm . . . unless the defendant's conduct is found to have been so extreme and outrageous that proof of bodily harm is not needed."  We stated that the element of severe emotional distress "may be satisfied without proof of objective symptomatology *if the defendant's conduct was so extreme and outrageous that it can be inferred that no reasonable person could endure the emotional response the conduct would naturally generate.*"  *Id.* ¶ 22 (emphasis added).  In *Lyman*, though, we concluded that severe emotional distress could not be inferred from the nature of the defendant's conduct alone, which involved years of emotional abuse by a domestic partner.  *Id.* ¶¶ 5-9, 23; *see also Latremore v. Latremore*, 584 A.2d 626, 632-33 (Me. 1990) (mentioning *Vicnire* but concluding that severe emotional distress was proved by evidence that the plaintiff's physical health had deteriorated).

[¶55]  In each of these cases, we relied on the Restatement (Second) of Torts § 46, comment k, which states that "if the enormity of the outrage carries conviction that there has *in fact* been severe emotional distress, bodily harm is not required."[13]  (Emphasis added.)  Although we have endorsed the alternative

---

[13]  Two examples in the Restatement (Second) of Torts illustrate how extreme the nature of the conduct must be to support an inference of severe emotional distress:

test, we have not yet decided a case in which the nature of the extreme and outrageous conduct alone was enough to satisfy the element of severe emotional distress.

[¶56] Plaintiffs contend that because the trial court concluded that there was a genuine issue of material fact whether CMP's conduct was extreme and outrageous, the question whether the conduct was sufficiently severe to infer severe emotional distress must also be submitted to a jury. Contrary to Plaintiffs' contention, it is for the court to make this determination initially. *See Bratton v. McDonough,* 2014 ME 64, ¶ 24, 91 A.3d 1050. An inference of severe emotional harm is available only in the very narrow circumstance where the conduct is so extreme and outrageous that "no reasonable person could

---

19. A, a police officer, arrests B on a criminal charge. In order to extort a confession, A falsely tells B that her child has been injured in an accident and is dying in a hospital, and that she cannot be released to go to the hospital until she confesses. B suffers severe emotional distress but no physical consequences. A is subject to liability to B.

20. A organizes a mob, and brings it to B's door at night. A tells B that unless he leaves town within ten days the mob will return and lynch him. B suffers severe emotional distress, but no physical consequences. A is subject to liability to B.

Restatement (Second) of Torts § 46 cmt. k, illus. 19 & 20; *see Lyman v. Huber*, 2010 ME 139, ¶ 21 n.3, 10 A.3d 707. The Restatement (Third) of Torts reaffirms the principle that physical manifestation of symptoms need not be proved if the severity of the extreme and outrageous conduct ensures the validity of the claim. *See* Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 46 cmt. j, illus. 10 (suggesting that a court could, based on the egregiousness of the conduct, enter judgment as a matter of law against a defendant who over a period of years sexually abused a child and placed the child under constant threat).

endure the emotional response the conduct would naturally generate." *Lyman*, 2010 ME 139, ¶ 22, 10 A.3d 707.

[¶57]  Here, the trial court properly concluded that a jury could find that CMP's use of notices containing misleading language in violation of administrative rules was extreme and outrageous conduct thereby satisfying the first element.  But we agree with the trial court that it does not follow that CMP's conduct was so extreme and outrageous that severe emotional distress must be inferred, particularly in light of the mitigating factors that were identified.  Some of those mitigating factors include the fact that CMP sent the notices to collect a valid debt that Plaintiffs owed CMP, the notices informed Plaintiffs that disconnection could be avoided by entering a payment plan, and the notices provided information on programs that offer financial assistance to low-income customers.  It does not follow from these allegations—sending notices that threaten disconnection of power in the winter while simultaneously offering means of relief—that severe emotional distress must be inferred.[14]  *See Lougee*, 2012 ME 103, ¶ 26, 48 A.3d 774 (noting that to

---

[14]  In denying Plaintiffs' request for class certification, the trial court made the following observations about the possible impact of CMP's conduct on putative class members: "Some members may have received the Disconnection Notice but not read it.  Those that read it may not have suffered any emotional distress for one reason or another, such as because they had forgotten to pay their bill but had the money to do so or they simply did not take it as a serious threat.  Even those that did suffer some emotional distress would have suffered it to different extents and manifested different, if any, symptoms."

establish liability on a claim of IIED a plaintiff must show that "the distress caused would be unbearably severe to an ordinarily-sensitive plaintiff").

[¶58]  In sum, we conclude that the trial court did not err in determining that "severe emotional distress cannot be inferred from CMP's extreme or outrageous conduct."

The entry is:

Judgments affirmed.

---

James E. Belleau, Esq., Adam R. Lee, Esq., and Alex S. Parker, Esq., Trafton, Matzen, Belleau & Frenette, LLP, Auburn; Sumner H. Lipman, Law Offices of Sumner Lipman, LLC, Scarborough; and Peter L. Murray, Esq. (orally), Murray, Plumb & Murray, Portland, for appellants Brett Deane, Henry Lavender, and Joleen Mitchell

Gavin G. McCarthy, Esq. (orally), Katherine S. Kayatta, Esq., and Matthew O. Altieri, Esq., Pierce Atwood LLP, Portland, for appellee Central Maine Power Company

Business and Consumer Docket docket number CV-2020-20
FOR CLERK REFERENCE ONLY